1              **UNITED STATES DISTRICT COURT**

2                  **DISTRICT OF OREGON**

3                 **PORTLAND DIVISION**

4  MARY D. STELZL,                    )
                                      )
5              Plaintiff,             )    No. 03:12-cv-01102-HU
                                      )
6  vs.                                )
                                      )
7  CAROLYN W. COLVIN[1],              )**FINDINGS & RECOMMENDATION**
   Commissioner of Social Security,  )
8                                     )
              Defendant.              )
9
10          _____

11 Drew L. Johnson
   Kathryn Tassinari
12 Drew L. Johnson, P.C.
   1700 Valley River Drive
13 Eugene, OR 97401

14      Attorneys for Plaintiff

15

16 S. Amanda Marshall
   United States Attorney
17 Adrian L. Brown
   Assistant United States Attorney
18 1000 S.W. Third Avenue, Suite 600
   Portland, OR 97204-2904
19

20 David Morado
   Regional Chief Counsel, Region X, Seattle
21 Willy M. Le
   Special Assistant United States Attorney
22 Social Security Administration
   Office of the General Counsel
23 701 Fifth Avenue, Suite #2900 M/S 221A
   Seattle, WA  98104-7075
24
        Attorneys for Defendant
25

26
        [1]Carolyn W. Colvin became acting Commissioner of Social
27 Security on February 24, 2013. Therefore, pursuant to Federal Rule
   of Civil Procedure 25(d), she is automatically substituted for
28 Michael J. Astrue as Defendant in this case.

1 - FINDINGS & RECOMMENDATION

1  HUBEL, United States Magistrate Judge:

2      The plaintiff Mary D. Stelzl seeks judicial review, pursuant

3  to 42 U.S.C. § 405(g), of the Commissioner's final decision denying

4  her applications for Disability Insurance benefits under Title II

5  of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, and

6  Supplemental Security Income benefits under Title XVI of the Act.

7  Stelzl argues the Administrative Law Judge ("ALJ") erred in failing

8  to give legally sufficient reasons for rejecting Stelzl's testi-

9  mony, her mother's testimony, and the opinions of her treating

10 psychiatrist and counselors; and in relying on vocational testimony

11 that was based on an inadequate hypothetical question. *See* Dkt.

12 ## 14 & 18.

13

14                    **I.  PROCEDURAL BACKGROUND**

15     Stelzl protectively filed her applications for DI and SSI

16 benefits on October 14, 2008, at age 37, claiming disability since

17 January 19, 1971 (Stelzl's date of birth), due to Asperger's

18 Syndrome, Type I diabetes, migraines, lower back problems, and

19 sleep apnea. (A.R. 12, 124-31[2]) Stelzl indicated these conditions

20 cause her problems "interacting socially with customers, clients,

21 co-workers and supervisers [sic]"; multi-tasking; blacking out if

22

23 ───────────────

24     [2]The administrative record ("A.R.") was filed electronically
   using the court's CM/ECF system. Dkt. #11 and attachments. Pages
25 of the A.R. contain at least three separate page numbers: two
   located at the top of the page, consisting of the CM/ECF number
26 (e.g., Dkt. #11-7, Page 17 of 89) and a Page ID#; and a page number
   located at the lower right corner of the page, representing the
27 numbering inserted by the Agency. Some pages also contain a page
   number inserted by the office supplying the records. Citations
28 herein to "A.R." refer to the agency numbering in the lower right
   corner of each page.

2 - FINDINGS & RECOMMENDATION

1  her blood sugar gets too low; numbness in her fingers and wrists;
2  severe migraines brought on by stress or anxiety; and the inability
3  "to do any type of physical work due to the risk of [her] disa-
4  bilities." (A.R. 158) Stelzl's applications were denied initially
5  and on reconsideration. (A.R. 75-88, 91-97) Stelzl requested a
6  hearing (A.R. 98-99), and a hearing was held on September 8, 2010,
7  before an ALJ.  Stelzl was represented by an attorney at the
8  hearing. Witnesses at the hearing included Stelzl, her mother, and
9  a Vocational Expert ("VE"). (A.R. 33-74)  On November 19, 2010,
10 the ALJ issued her decision, denying Stelzl's applications for
11 benefits. (A.R. 9-22)  Stelzl appealed the ALJ's decision, and on
12 April 26, 2012, the Appeals Council denied her request for review
13 (A.R. 1-4), making the ALJ's decision the final decision of the
14 Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. Stelzl filed a
15 timely Complaint in this court seeking judicial review of the Com-
16 missioner's final decision denying her applications for DI and SSI
17 benefits.  Dkt. #1.  The matter is fully briefed, and the under-
18 signed submits the following findings and recommended disposition
19 of the case pursuant to 28 U.S.C. § 636(b)(1)(B).

20

21                    *II.  FACTUAL BACKGROUND*

22              *A.  Summary of the Medical Evidence*

23      On January 28, 1983, at age 12, Stelzl underwent an EEG in the
24 Neurodiagnostic Unit of Saint John's Hospital & Health Center, in
25 Santa Monica, California.  The EEG was "abnormal," and "[a]lthough
26 not diagnostic of seizures, the abnormalities . . . [were] very
27 suggestive of an underlying seizure disorder."  (A.R. 231)

28

1      The record contains a letter dated October 31, 1995, from

2  psychiatrist Mary H.F. Christianson, M.D.  No treatment notes or

3  other records from Dr. Christianson appear in the record.  In the

4  letter, Dr. Christianson states Stelzl, then age 25, had been

5  treated with "supportive psychotherapy throughout her developing

6  years."  The doctor further stated as follows:

> Miss Stelzl had severe learning disability,
> borderline intelligence and immature behavior
> which manifested itself by inappropriate beha-
> vior for her age and at times poor judgement.
> Since age 7 with continual parental support,
> appropriate private schools, educational
> tutoring, and supportive psychotherapy, Miss
> Stelzl has been able to make an adjustment to
> independent life and minimal wage employment.
> However, she will continue to need financial
> assistance, medical assistance for her
> diabetes and from time to time supportive
> therapy.

14  (A.R. 537)  Dr. Christianson commended Stelzl's parents, and

15  expressed the hope that they would "continue the ongoing support

16  that [Stelzl] most likely will need."  (*Id.*)  The letter is

17  addressed "To Whom It May concern," and there is no indication in

18  the record regarding to whom the letter was directed or for what

19  purpose it was written.

20      The record contains no further evidence of Stelzl's physical

21  or mental health until March 28, 2002, when Stelzl was seen in the

22  emergency room with a complaint of "blood sugar control problems."

23  (A.R. 421; *see* A.R. 421-25)  Stelzl was noted to be "somewhat of a

24  poor historian." (A.R. 421)  She was unable to give accurate

25  information about what medications she was taking.  She stated she

26  had last seen her doctor in January 2002, but records indicated she

27  had seen her doctor on March 11, 2002.  Stelzl complained of

28  intermittent, nonspecific abdominal pain for the preceding two

4 - FINDINGS & RECOMMENDATION

months.  She also described some episodes of "black outs" in con-
nection with low blood sugars.  The ER physician discussed Stelzl's
case with another doctor who was on call for Stelzl's primary care
physician, Internal and Preventive Medicine specialist Geraldine
Darroca, M.D.  The doctors made some adjustment to Stelzl's insulin
dosing schedule, but indicated she needed "very close follow-up"
for management of her diabetes. (A.R. 423-24)

On April 10, 2002, Stelzl saw Internal Medicine specialist
Ronald Cirullo, M.D. for an endocrinology evaluation, on referral
from Dr. Darroca.  (A.R. 284-86, 353-55)  Notes indicate
Dr. Cirullo had treated Stelzl in 1996 and 1997, and she had been
followed by another doctor in the interim.  Stelzl reported "marked
variability in blood sugars including frequent hypoglycemic epi-
sodes." (A.R. 284)  The adjustment to her medications by the ER
physicians had not yielded satisfactory results.  Stelzl expressed
frustration with her variable blood sugars, and notes indicate she
"tend[ed] to overcompensate [in her insulin dosing] in both
directions." (*Id.*)  Stelzl had been living with her mother due to
Stelzl's difficulty maintaining her blood sugars.  Her mother
accompanied her to this appointment, and the doctor noted Stelzl
and her mother "had some interchange here today, which indicates
that they may not be on the same page as far as control of
[Stelzl's] blood sugars and her insulin." (*Id.*)  Notes indicate
Stelzl is 5'1" tall, and at this time her weight was 156 pounds.
The doctor counseled Stelzl about the importance of making insulin
adjustments not only based on her blood sugar level, but also on
her carbohydrate intake.  He prescribed a new plan of action for

1  monitoring blood sugar and carbohydrates, and directed Stelzl to
2  return in one week for followup.

3      Stelzl saw Dr. Cirullo again on April 16, 2002, to check on
4  her blood sugars and insulin dosage.  Stelzl was doing better, and
5  the doctor scheduled her to meet with a dietician to discuss
6  carbohydrate management and its relationship to insulin dosing.
7  (A.R. 352)

8      On June 24, 2002, Stelzl saw Dr. Cirullo and a dietician for
9  followup.  Stelzl was having ongoing difficulty making decisions
10 about her insulin dosage.  The doctor reviewed this with her "again
11 at length."  (A.R. 350)  Stelzl's mother was present, and indicated
12 she would help Stelzl with her dosage.  The doctor indicated proper
13 dosage was necessary to avoid the hypoglycemic episodes Stelzl was
14 experiencing.  (*Id.*)

15     Stelzl saw Dr. Cirullo on July 29, 2002, for followup.  Her
16 blood sugar was fluctuating widely.  The doctor noted Stelzl was
17 not calculating her carbohydrates accurately, and as a result, she
18 was not using the correct amount of insulin.  Stelzl also was not
19 including in her calculations her level of physical activity, which
20 included gardening, shopping, and cleaning her house.  Stelzl was
21 frustrated and irritable when discussing her diabetes.  She was
22 counseled in monitoring her carbohydrate intake and blood sugar
23 levels, and was directed to keep a log and bring it to the doctor
24 in four days for review.  Dr. Cirullo noted Stelzl "has had
25 diabetes for many years and has been frustrated with this but also
26 has an obvious limited capacity for understanding even at her age."
27 (A.R. 348)

28

6 - FINDINGS & RECOMMENDATION

1    Stelzl returned to see Dr. Cirullo for followup on August 20,
2    2002. Stelzl's blood sugars had shown "[t]remendous improvement,"
3    and were "much more stable" on her new plan. (A.R. 281) The
4    doctor noted Stelzl was "starting to make good decisions about her
5    diabetes management." (*Id.*) She was feeling better overall, and
6    the doctor hoped Stelzl would continue following her plan with
7    regard to carbohydrate intake and insulin dosing. (*Id.*; A.R. 345-
8    46)

9    Stelzl returned to see Dr. Cirullo on November 12, 2002, for
10   followup. She also saw a dietician. The doctor noted, "We have
11   been working with [Stelzl] over the past few months to adjust
12   carbohydrate and insulin. She seems to be doing a reasonable job
13   of making adjustments and is very meticulous recording her carbohy-
14   drate and insulin information. Review of blood sugars for the past
15   few months shows she has used fairly good judgment in adjusting
16   insulin to her carbohydrates." (A.R. 276) Stelzl's weight at this
17   time was 151.4 pounds. Stelzl was counseled regarding the
18   relationship between her diet, medications, and blood sugar levels.
19   (A.R. 277, 343-44)

20   Stelzl saw Dr. Cirullo for followup on January 21, 2003.
21   (A.R. 274-75) Stelzl was adhering to her recommended diet, and
22   administering insulin as needed to keep her blood sugars under
23   control. She was having hypoglycemic episodes that were of some
24   concern, and the doctor recommended "a graded snack based upon her
25   blood sugars" to address those episodes. Her medications and
26   insulin dosing schedule were adjusted. (A.R. 275, 341-42)

27   On May 29, 2003, when she was 32 years old, Stelzl underwent
28   a consultative evaluation at the Child Development Clinic of the

7 - FINDINGS & RECOMMENDATION

1  Oregon Health & Science University (the "CDRC").  (A.R. 233-43)

2  Stelzl's mother referred her for the evaluation due to concerns

3  that Stelzl might have Asperger's Syndrome.  Her mother expressed

4  particular concerns about Stelzl's ongoing difficulties with social

5  interactions and communication.  Stelzl and her mother provided the

6  following history:

> Family's first developmental/behavioral con-
> cerns were when [Stelzl] was in nursery
> school.   Teacher  raised  the  question  of
> seizures as [Stelzl] spent much of the time
> not listening, staring, or apparently self-
> absorbed.  Episodes  were  not  seizures  but
> indicative of difficulty engaging [Stelzl] in
> school activities, particularly group activi-
> ties.   She has a history of being a slow
> learner as well as ongoing behavioral con-
> cerns.  She was evaluated by a child psychia-
> trist at ten years of age and was treated with
> Ritalin for apparent ADHD (attention-deficit
> hyperactivity disorder), inattentive type, for
> several months, and this medication was dis-
> continued as it appeared to be ineffective.
> She has received special educational support
> in school and attended a private high school
> where she received special education support
> for math as well as tutors.   Currently,
> [Stelzl] is working in a real estate office
> three days per week and doing volunteer work
> one day a week.  She lives independently with
> minimal support from her mom.  She does have
> ongoing issues with anxiety and depression and
> does prefer a definite schedule or structure
> to her day.  She describes herself as nervous
> in big groups.  She has no friends here.  She
> does have some repetitive behaviors such as
> checking  locks  and  burners  on  the  stove,
> though does not describe obsessions.  She has
> shown  no  recent  change  in  activity  level,
> routines,  appetite,  or  other  somatic
> issues. . . .
>
> [Stelzl] also has complicated health issues,
> particularly insulin-requiring diabetes. She
> has had difficulties with self-management in
> the  past[;]  however  apparently  this  is
> improved at this time.  She does have monthly
> appointments with her primary care physician
> and a nutritionist.  Her most recent hemoglo-
> bin A1C was in an acceptable range. . . .

8 - FINDINGS & RECOMMENDATION

1    Diagnosis of diabetes was made at 15 years of
2    age.

3   (A.R. 234)  Stelzl's diabetes management was noted to be "stable"

4   . . . although she [was] receiving a good deal of ongoing support

5   from primary care office and the nutritionist."  (A.R. 235)

6        Stelzl's mother provided further information regarding

7   Stelzl's educational history:

8        Academically, [Stelzl] did attend private
         schools and often had tutors for both reading
9        and math.  She was evaluated cognitively in
         1982 at the age of 11 when she was in the
10       middle of fifth grade.  At that time, she
         earned a verbal IQ of 88, performance IQ of
11       80, and full scale IQ of 83.  IQ scores were
         somewhat lower than those on the Wide Range
12       Achievement Test, which is essentially a
         screening test for academics.  She was also
13       three years below grade level on the ITPA
         language test.  On the Wide Range Achievement
14       Test, she earned grade equivalents of 7.1 for
         reading, 6.2 for spelling, and 4.5 for math.
15       She was diagnosed with a severe processing
         deficit with low visual matching skills and
16       low short-term memory and reading comprehen-
         sion. In 1995, she received some psychothera-
17       py for her severe learning disability, low
         average IQ, and immaturity.  Previous to this
18       time at the age of six, she had had a psychia-
         try referral because of explosive behavior and
19       apparently had another IQ test done yielding a
         Binet IQ of 97 and a nonverbal WISC IQ of 89.
20       There seems to be a pattern of relative
         strengths in verbal skills and somewhat lower
21       skills in nonverbal performance.

22  (A.R. 236)

23       Stelzl reportedly had few friends throughout her life, with

24  "significant difficulties with the reciprocity of . . . conversa-

25  tion."  (A.R. 237)  Her mother described her as "very rigid," and

26  easily upset by crowds, with regular "[m]eltdowns and upsets."

27  (Id.)  According to her mother, Stelzl even had problems with small

28  family dinners outside of her ordinary routine.  (Id.)

9 - FINDINGS & RECOMMENDATION

Stelzl stated she "does drive and lives in a duplex owned by her father[.]" (*Id.*) She had a part-time job "in an office doing filing," but stated she had "difficulty with spatial directions in that she [could] not go on multiple errands finding her way from one place to the next but often ha[d] to come back to home base in between errands, so that she [knew] how to get places." (*Id.*)

Pediatric Psychologist Debra Eisert, Ph.D. noted Stelzl made "inconsistent eye contact" throughout the assessment, talking rapidly, and moving rapidly "from one topic to another often in a tangential manner." (*Id.*) The doctor observed that Stelzl "misses social cues, does not know what to do when the listener is dis-interested, and often gives too much detail about her daily life." (*Id.*) She had pervasive "speech abnormalities we often associate with autism such as rapid rate and odd intonation." (*Id.*) The doctor indicated Stelzl "does not have a reasonable conversation for someone who is 32. Eye contact and facial expressions are unusual, and she does not seem to enjoy the interaction. However, she has a fairly good vocabulary for emotional experiences and describes feeling mortified and humiliated when describing an experience with her ex-husband." (*Id.*)

Stelzl also described periodic bouts of depression, including having thoughts of committing suicide by "not taking her medica-tion, starving herself, or overdosing." (A.R. 238) Stelzl stated she enjoyed watching television, attending an Asperger's support group, and "doing things in her yard." (*Id.*)

Dr. Eisert concluded Stelzl "does meet some of the criteria for Asperger syndrome, including social and communication charac-teristics." (*Id.*) She recommended Stelzl be evaluated by a

psychiatrist "to determine whether her depression and anxiety symptoms warrant treatment." (*Id.*) A social worker who evaluated Stelzl concurred in the recommendation that she receive a psychiatric evaluation. (A.R. 243)

Stelzl also underwent a speech and language evaluation by Speech/Language Pathologist Kyra Carroll. On the Adolescent Test of Problem Solving, Stelzl scored 36, "an average score for someone 12 years 11 months [of age]." (A.R. 240) Carroll noted that, overall, Stelzl's "communication style of hyperverbosity, unusual intonation and loudness patterns, limited eye contact and pragmatic skills, as well as some tendency to take things literally and perseverate during communication are consistent with a diagnosis of Asperger syndrome. However, they may also be indicative of other social communication problems[.]" (*Id.*)

After evaluating Stelzl fully, and "researching [Stelzl's] questions about a diagnosis of Asperger Syndrome," the CDRC staff wrote to Stelzl on September 11, 2003, to inform her of their determination "that a provisional diagnosis of Asperger Syndrome is appropriate." (A.R. 244) Dr. Eisert explained that the provisional diagnosis meant the staff believed the diagnosis was accurate, although some of Stelzl's symptoms were "currently difficult to qualify." (*Id.*) Dr. Eisert informed Stelzl that her diagnosis qualified her "for all appropriate services designed for people with Asperger syndrome such as support groups, therapy, vocational supports and educational accommodations." (*Id.*)

In the interim between Stelzl's evaluation by the CDRC staff, and the letter explaining her provisional diagnosis, Stelzl underwent a psychiatric evaluation by psychiatrist Rebecca Gordon,

11 - FINDINGS & RECOMMENDATION

1  M.D. (A.R. 309-12)  The evaluation took place in two sessions, on
2  June 24 and July 8, 2003.  Stelzl stated the CDRC diagnosis of
3  Asperger's disorder "was uncertain," and she questioned whether she
4  met the criteria for the disorder.  Stelzl also stated she was
5  "looking for a job," and had "trust issues."  (A.R. 309)  Stelzl
6  reported good appetite and sleep, no recent weight changes, no
7  daytime napping, and up-and-down energy fluctuations.  She stated
8  she had experienced depression with suicidal ideations about a
9  month before the first evaluation session.  She described her self-
10 esteem as "shaky," and stated she frequently became irritated with
11 her family members.  However, Stelzl did not consider herself to be
12 particularly anxious, and reported no specific phobias or panic
13 episodes. She reported a couple of compulsive behaviors; i.e.,
14 "checking locks several times before going to bed," and "check[ing]
15 her watch constantly."  (*Id.*)

16      Stelzl indicated she had a long history of seeing therapists.
17 She began seeing a therapist at age ten for temper tantrums, and
18 saw the therapist for many years.  Ritalin was tried briefly, with
19 no apparent benefit, and she had not tried any other psychotropic
20 medications.  Stelzl reported a history of migraine headaches,
21 insulin-dependent diabetes type I since age 14, and "a high pain
22 tolerance." (A.R. 310)  Dr. Gordon did not administer any tests;
23 her mental status examination consisted of interviewing Stelzl and
24 observing her during the interview.  The doctor noted Stelzl
25 appeared to be of average intelligence.  She had intact memory to
26 both recent and remote events.  Her affect was "constricted and
27 blunted[,]" and she had "good eye contact but little facial expres-
28 sion.  Thought processes were logical, goal-oriented and coherent.

12 - FINDINGS & RECOMMENDATION

Thought content was reality based." (A.R. 311)  Stelzl displayed
only fair insight into her problems, and fair judgment.  Although
her demeanor was pleasant, Dr. Gordon had the sense that Stelzl was
"somewhat disconnected emotionally from the situation." (*Id.*)

Dr. Gordon's Axis I diagnosis was: "Depressive disorder, NOS.
Asperger's disorder.  Rule out dysthymia versus major depression.
Rule out anxiety disorder.   Rule out obsessive/compulsive
disorder." (*Id.*)  She estimated Stelzl's current GAF at 50.[3]
Dr. Gordon indicated Stelzl met the DSM-IV criteria for Asperger's
disorder and depressive disorder NOS.  She recommended Stelzl
increase the time she spent around peers, and perhaps obtain "some
training on how to interact with others." (*Id.*)  She also recom-
mended Stelzl obtain therapy to assist her in "[c]oming to terms
with [the] criteria of Asperger's disorder, [and] learning how to
help herself from falling into depression." (*Id.*)  Dr. Gordon met
with Stelzl again on July 17 and 28, 2003, to discuss her
evaluation results, the DSM-IV criteria for Asperger's disorder,
and her provisional diagnosis.  (A.R. 307)

On August 19, 2003, Stelzl saw Dr. Cirullo for followup of her
Type 1 diabetes, migraine headaches, hypertension, and hyper-
lipidemia.  Her blood sugars and hypoglycemic episodes were under
better control, and her medications were continued without change.
(A.R. 272-73, 339-40)

---

[3]A GAF level of 50 is consistent with "'serious symptoms
(e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job).'"
*McFarland v. Astrue*, 288 Fed. Appx. 357,l 369 (9th Cir. 2008)
(quoting Am. Psych. Ass'n, *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th ed. 2000).

13 - FINDINGS & RECOMMENDATION

Stelzl and her mother saw Dr. Gordon on September 15, 2003, "to discuss provisional diagnosis of Asperger's disorder, along with adjustment disorder, NOS." (A.R. 306) Stelzl's mother thought it was important for Stelzl to know about the disorder "as it may assist her in connecting with others." (*Id.*) Dr. Gordon encouraged Stelzl to interact with others, such as going out to lunch and joining a group. (*Id.*)

Stelzl saw Dr. Gordon again on October 16, 2003. Stelzl "report[ed] increased socialization, attending a social skills class for people with Asperger's where she ha[d] met a new woman friend with whom she [was] spending much time." (A.R. 305) Stelzl was attending the Asperger's group monthly, and was working on learning to read people's facial expressions and increasing eye contact. She stated facial expressions were "a foreign language to her." (*Id.*)

On December 4, 2003, Stelzl saw Dr. Cirullo for followup of her Type 1 diabetes. Stelzl's blood sugars were "doing very well," and Stelzl was actively "monitoring her carbohydrates and adjusting insulin appropriately." (A.R. 267) Her medications were continued without change. (A.R. 337-38)

On December 15, 2003, Stelzl saw Dr. Gordon, reporting that she was doing well. She continued to work part time, and had been "attending a social skills class where she [was] learning things such as eye contact, how to compliment people and not interrupting others." (A.R. 304) Stelzl was enjoying the class, and had met a new friend with whom she had been spending a lot of time. She had applied for Vocational Rehabilitation, and was "applying for state jobs, [and] looking into basic computer classes." (*Id.*)

14 - FINDINGS & RECOMMENDATION

1  Dr. Gordon noted Stelzl's affect was bright; she smiled and laughed
2  appropriately; she denied any major depressive episodes recently;
3  and she felt things were going well for her.  She was directed to
4  return in three months for followup.  (*Id.*)

5      Stelzl saw Dr. Gordon for followup on March 8, 2004.  Stelzl
6  reported having several "low days" over the previous few weeks,
7  with "[m]ild to moderate feelings of anger and irritability."
8  (A.R. 303)  She had experienced some thoughts of suicide two weeks
9  earlier, "with the thought of 'getting into [her] car to do it.'"
10 (*Id.*)  She had broken up with a boyfriend, and had been in a
11 stressful interaction with a friend Stelzl described as "too pushy,
12 to the point of harassment."  (*Id.*)  Stelzl was "taking a typing
13 class, . . . job-hunting, and . . . working with a case manager on
14 finding a job through the state."  (*Id.*)  Her affect was unchanged.
15 The doctor prescribed a trial of Prozac, starting at 10 mg. daily
16 for one week, and then increasing to 20 mg. daily.  She directed
17 Stelzl to return for followup in three weeks.  (*Id.*)

18     On April 5, 2004, Stelzl saw Dr. Gordon for followup.  Stelzl
19 reported, "I'm doing great; things couldn't be better."  (A.R. 302)
20 She was attending meetings of the Autism/Asperger's support group,
21 and her sleep, appetite, and energy were "great."  (*Id.*)  She had
22 resumed a relationship with her boyfriend, and reportedly was
23 "[s]till job-hunting."  (*Id.*)  Her mood generally was good, with
24 "very few anxieties."  (*Id.*)  She was not experiencing any adverse
25 effects from the Prozac, and the doctor noted Stelzl's depressive
26 disorder was "much improved" on the medication.  (*Id.*)  Stelzl was
27 directed to return for followup in two months.  (*Id.*)

28

15 - FINDINGS & RECOMMENDATION

On June 10, 2004, Stelzl saw P.A. John R. Nelson, in Dr. Cirullo's office, for followup and evaluation of a recent episode of hypoglycemia.  P.A. Nelson indicated Stelzl had "developed profound hypoglycemic unawareness." (A.R. 368)  He revised Stelzl's insulin dosages, and instructed her "to practice permissive hyperglycemia" in order to regain her hypoglycemic awareness.  He also ordered a coronary risk panel, and a metabolic panel.  (A.R. 369)

Stelzl saw Dr. Gordon on June 22, 2004, for followup.  Her weight at that time was 150 pounds.  She was taking Prozac 20 mg. daily, with no adverse effects.  Stelzl indicated the Prozac had been "extremely beneficial." (A.R. 301)  She had more energy, was sleeping less, and felt happier.  She stated she was keeping herself busy so she would be tired at the end of the day.  Her affect was bright, and eye contact was better.  Her speech was "nonpressured, normal rate, with no perceptual distortions." (*Id.*)  Stelzl had "become quite involved with several friends through the Asperger's group.  She continue[d] to search for a new job, applying for a state job, with the help of a state and vocational rehab counsel[or]." (*Id.*)  She planned to sign up for a computer class.  The Prozac was continued without change, and Stelzl was directed to return for followup in three months.  (*Id.*)

Stelzl saw Dr. Cirullo on August 18, 2004.  Stelzl continued to have problems regulating her insulin dosages and blood sugar levels, but the doctor indicated she only needed "some minor adjustments," and she was "doing quite well taking care of her own insulin." (A.R. 356)  Stelzl's weight was 158 pounds at this time. (*Id.*)

16 - FINDINGS & RECOMMENDATION

On August 24, 2004, Stelzl saw Internal Medicine specialist Robert Pelz, M.D. "for a travel consult in preparation for a trip to Costa Rica that she will be taking with her father." (A.R. 265) During the eight-day trip, Stelzl and her father planned to stay "in first class Western style resorts." (*Id.*) Stelzl and her mother indicated that Stelzl had taken a trip to Turkey in 1996, and Stelzl had gotten some vaccinations beforehand. Although Dr. Pelz saw no need for a typhoid vaccination, Stelzl wanted one anyway, so the doctor administered an oral vaccine, as well as a tetanus shot. The doctor also recommended a vaccination for Hepatitis, but this was delayed until Stelzl could obtain her medical records to determine whether she had already been vaccinated for Hepatitis. She received a prescription "for Chloroquine for malaria prophylaxis and Cipro to take [as needed] for traveler's diarrhea." (*Id.*) She was advised to use insect repellant. (*Id.*)

Stelzl saw Dr. Gordon on September 13, 2004, for followup. She was taking Prozac 20 mg. daily, with no adverse effects. Stelzl reported feeling "extremely well," and she was "quite excited about friendships made through the autism group in town, including going to an autism retreat in August 2004." (A.R. 300) Her work and family relations were going well, and Stelzl planned to sign up for a computer class. The doctor noted Stelzl was "[n]ot yet receiving state assistance for problems related to Asperger's disorder." (*Id.*) The Prozac was continued without change, and Stelzl was directed to return in six months for followup. (*Id.*)

On September 18, 2004, Stelzl saw P.A. Nelson for followup of her diabetes. Stelzl's diabetes was under poor control, and she was noted to have "severe hypoglycemic unawareness." (A.R. 358) She

17 - FINDINGS & RECOMMENDATION

was instructed in the use of a new glucose meter, and her insulin-to-carbohydrate ratio was changed in hopes this would reduce her blood sugars somewhat. (*Id.*)

Stelzl saw P.A. Nelson on September 30, 2004, "with a chief complaint of poorly controlled blood sugars." (A.R. 360) Stelzl's current weight was 162 pounds. She reported significant fluctuations in her blood sugars over the previous week, accompanied by fatigue. A lab test revealed that she had a urinary tract infection, which was diagnosed as the cause of her hyperglycemia. Antibiotics were prescribed. (*Id.*)

Stelzl saw Dr. Gordon on March 31, 2005, for followup. Stelzl was still taking Prozac 20 mg. daily. Stelzl had been living with her boyfriend for seven months, and he accompanied her to this visit. Dr. Gordon noted Stelzl was comfortable with her boyfriend in the room, and seemed to appreciate his being there. Stelzl's boyfriend "said that when [Stelzl] first started Prozac, he noticed her speech was more pressured, [and] she seemed more hyperactive. There are times now when she will become 'obsessive making crafts, she will have no time for anything else and will stay up later doing them.'" (A.R. 299) Stelzl stated she was sleeping well. Stressors included her mother's recent diagnosis with breast cancer, and her grandmother's terminal illness. Stelzl still "had the same job that she had before." (*Id.*) Dr. Gordon noted Stelzl seemed "slightly more dysphoric, with non-pressured, normal rate of speech, [and] fair eye contact." (*Id.*) Stelzl appeared "more tired," but her thought processes were "logical, goal directed, [and] coherent." (*Id.*) Dr. Gordon noted Stelzl could be experiencing grief regarding her mother's and grandmother's health conditions, causing some "mood

18 - FINDINGS & RECOMMENDATION

cycling and/or some obsessive features." (*Id.*)  Stelzl's blood
sugar had been fluctuating more, and she was encouraged to see
Dr. Cirullo regarding her diabetes control.  Dr. Gordon increased
the Prozac dosage to 30 mg. daily, and directed Stelzl to return in
three weeks for followup, or sooner if needed.  (*Id.*)

On April 12, 2005, Stelzl saw P.A. Nelson for followup of her
poorly controlled blood sugars.  Her current weight was 172 pounds.
She reported continued wide fluctuations in her blood sugars.
Stelzl's boyfriend, who accompanied her to the visit, inquired about
the possibility of an insulin pump for Stelzl, but P.A. Nelson
indicated he was "not sure that [Stelzl] has the skills at this
point to be successful with a pump." (A.R. 362)  Stelzl's medica-
tions were adjusted, and she was directed to advise the doctor's
office of her blood sugars in one week, and follow up in one month.
(A.R. 362-63)

On April 21, 2005, Stelzl saw Dr. Gordon for followup.  Stelzl
reported improved energy and mood, and no sleep disturbances.  The
doctor noted Stelzl had improved eye contact, and did not appear as
fatigued.  Dr. Gordon indicated Stelzl's depression had "improved
with medication increase." (A.R. 298)  She directed Stelzl to
return in three months for followup.

Stelzl saw Dr. Gordon on July 11, 2005, for followup.  She was
taking Prozac 30 mg. daily.  She complained of fatigue for the
previous three weeks, but she was still doing all of her activities.
She was sleeping seven hours a night, but would wake up feeling
tired.  Stelzl reported that she was looking for a job to fill her
time; she currently was working twelve hours a week, and was doing

19 - FINDINGS & RECOMMENDATION

1  some crafting with a friend.  Stelzl was continued on the Prozac.

2  She was directed to return in three months for followup.  (A.R. 297)

3       On August 2, 2005, Stelzl saw P.A. Nelson for followup of her

4  fluctuating blood sugars, progressive weight gain (her current

5  weight was 179 pounds), and abdominal pain.  (A.R. 364)  Records

6  indicated Stelzl had gained 27 pounds during the previous year.

7  P.A. Nelson opined Stelzl was simply overeating.  In addition,

8  Stelzl had not been exercising, so she was not "burning up

9  additional calories." (A.R. 365)  P.A. Nelson directed Stelzl "to

10 cut down on her food," and "reinitiate her exercise plan." (*Id.*)

11 He referred her to Dr. Darroca for evaluation of her abdominal pain.

12 (*Id.*)

13      Stelzl returned to see P.A. Nelson on August 11, 2005.  She had

14 been exercising, "working in her yard pretty much every day," and

15 watching her diet.  Her weight was down two pounds from her previous

16 visit, and her blood sugars were more on target.  (A.R. 366)

17      Stelzl saw dietician Julie C. Scalisi on October 5, 2005, for

18 followup and counseling.  Stelzl was instructed in being more

19 accurate in carbohydrate counting, using a food scale, and recording

20 her blood sugar values.  Stelzl was asked to bring in her log sheet

21 and food record at her next visit.  (A.R. 315)

22      On October 11, 2005, Stelzl saw P.A. Nelson for "evaluation of

23 a severe hypoglycemic episode." (A.R. 367)  Within 45 minutes of

24 waking up and taking her insulin, Stelzl's blood sugar had plummeted

25 to 23, and she had become "unaware of her surroundings." (*Id.*)

26 P.A. Nelson suspected that Stelzl had inadvertently switched her

27 medications, taking too much of one and not enough of the other.

28

20 - FINDINGS & RECOMMENDATION

1 He advised Stelzl to "be especially cautious about drawing up her
2 insulin." (*Id.*)

3     Stelzl saw Dr. Darroca on October 21, 2005, for followup of her
4 type I diabetes. Stelzl was counseled regarding hypoglycemia, diet,
5 blood sugar monitoring, and carbohydrate consumption. In addition,
6 Stelzl apparently had been taking Crestor for hyperlipidemia, and
7 had developed reactions including extreme fatigue and myalgias. She
8 reported that when she stopped taking the Crestor, her symptoms
9 resolved. She was directed to follow up with Dr. Cirullo regarding
10 further treatment. (A.R. 316-17)

11     On October 25, 2005, Stelzl saw dietician Scalisi for followup
12 and counseling. Stelzl was having "frequent and significant hypo-
13 glycemia." (A.R. 263) Her insulin dosage was changed, and Stelzl
14 was counseled regarding dosages and carbohydrate intake prior to
15 exercise. (A.R. 264, 318)

16     Stelzl saw Dr. Gordon on November 1, 2005. She reported her
17 mood as generally good, with no significant anxiety. She was
18 sleeping well. Her appetite was good, but she had gained ten
19 pounds. She was not getting much exercise, and her energy level was
20 low. She had recently separated from her boyfriend, noting they had
21 been together for one year. Notes indicate Stelzl had been assigned
22 to a different psychiatrist, but she chose to return to see
23 Dr. Gordon instead. Another doctor (a Dr. Salvador) had discon-
24 tinued Prozac, and started Stelzl on Celexa 20 mg. daily, and
25 Wellbutrin. Dr. Gordon did not make any changes in Stelzl's medica-
26 tions at this time. (A.R. 296)

27     On November 30, 2005, Stelzl saw Scalisi for followup and
28 counseling regarding diet, nutrition, exercise, and insulin dosages.

21 - FINDINGS & RECOMMENDATION

1  A.R. 261-62)  Stelzl was having fewer episodes of hypoglycemia,
2  although Scalisi indicated the episodes were "still too frequent."
3  (A.R. 261)

4      Stelzl saw P.A. Nelson for followup on December 15, 2005.  Her
5  dyslipidemia medication had been switched from Pravachol to Crestor,
6  but Stelzl had developed severe abdominal pain due to the Crestor.
7  It was stopped, and she had "not had any statin drugs for at least
8  the last six to eight weeks." (A.R. 370)  Her current weight was
9  176 pounds.  Notes indicate her blood sugars still were not
10  adequately controlled, although her hypoglycemic episodes had
11  reduced in severity and frequency.  P.A. Nelson advised Stelzl to
12  keep a food log, writing down what she had eaten when she had a high
13  blood sugar level.  He restarted Stelzl on Pravachol.  (*Id.*)

14      Stelzl saw Dr. Gordon on February 7, 2006.  At that time,
15  Stelzl was taking Celexa 20 mg. daily, and Klonopin .5 mg as needed
16  for "leg twitches."  Wellbutrin had been discontinued two months
17  earlier.  Stelzl reported poor sleep, waking up tired, and staying
18  in bed more.  She was getting some exercise on a treadmill.  Her
19  affect was noted to be flat, serious, and slow moving.  She denied
20  anxiety.  Dr. Gordon suggested decreasing the Celexa to 10 mg. daily
21  because the medication might be causing weight gain and lethargy.
22  Stelzl agreed to try the lower dosage.  (A.R. 295)

23      Stelzl returned for followup on March 7, 2006, and reported no
24  significant difference on the lower Celexa dosage.  She was sleeping
25  well, but having some daytime fatigue and reduced energy. She was
26  bowling for fun. She had a temporary roommate. Her blood sugar had
27  been "a little high," in the 300-400 range.  The doctor advised
28  Stelzl to see a dietician, and follow up in one month with her

22 - FINDINGS & RECOMMENDATION

1 primary care physician.  They discussed the possibility of tapering

2 off the Celexa.  (A.R. 294)

3     On March 27, 2006, Stelzl returned to see P.A. Nelson for

4 followup of dyslipidemia and diabetes.  Stelzl's blood sugar logs

5 indicated she was over-correcting for hyperglycemia, resulting in

6 episodes of hypoglycemia.  She was counseled on proper correction,

7 and her insulin dosage was adjusted.  (A.R. 372)

8     On April 4, 2006, Stelzl saw Dr. Gordon for followup.  Stelzl

9 had reduced her coffee intake from four cups to one cup daily, and

10 stated she felt she was "[b]ack to [her] old self more," with more

11 energy.  (A.R. 293)  She was doing well on Celexa.  The doctor

12 directed her to return in three months for followup.  (*Id.*)

13     Stelzl saw P.A. Nelson on April 24, 2006, for followup of her

14 diabetes.  Her current weight was 180 pounds.  Her blood sugars

15 continued to be widely variable, without an identifiable pattern.

16 Her insulin dosages were adjusted.  (A.R. 373)  Her blood sugars

17 continued to be uncontrolled on July 27, 2006.  P.A. Nelson

18 determined that Stelzl was not logging her snacks and desserts,

19 particularly at night.  Her current weight was 183.6 pounds.

20 P.A. Nelson prescribed a trial of a different insulin, although he

21 suspected most of Stelzl's problems were due to "dietary diffi-

22 culties as well as eating and not taking additional insulin." (A.R.

23 374)  Stelzl was directed to keep a log of all of her food intake

24 and insulin for two weeks.  (*Id.*)

25     Stelzl saw Dr. Gordon on August 1, 2006, reporting no new

26 changes.  Her mood was steady without extremes.  Her sleep and

27 appetite were good.  She was doing scrapbooking for pleasure, and

28 was looking into some "office work classes" at Lane Community

1  college.  (A.R. 292)  She made good eye contact and was relaxed,
2  although her affect was slightly "blunted."  (*Id.*)  Dr. Gordon
3  believed Stelzl was benefitting from her medications, and from her
4  quarterly visits with the doctor, which helped Stelzl assess and
5  identify short and long-term personal goals, and gave her support
6  and encouragement.  Stelzl was directed to return in three months
7  for followup.  (*Id.*)

8      Stelzl saw P.A. Nelson on August 17, 2006.  Her blood sugars
9  had been "extremely poorly controlled" after switching her insulin.
10 She was returned to her previous insulin.  Stelzl's mother was with
11 her, and they discussed the possibility of an insulin pump with P.A.
12 Nelson, agreeing that with Stelzl's autism, "a pump would not be the
13 best option."  (A.R. 375)  Stelzl expressed frustration with her
14 inability to control her blood sugars, and P.A. Nelson told her
15 "about new technologies which should be available within the next
16 few years for easier treatment of type I diabetes."  (*Id.*)

17     Stelzl saw P.A. Nelson for followup on September 14, 2006.
18 Notes indicate Stelzl was "trying very hard" to follow the
19 dietician's recommendations, including eating a 1500-calorie-a-day
20 diet and no snacks.  Stelzl also had started walking recently.  Her
21 blood sugar control had "improved dramatically."  (A.R. 376)  Her
22 weight at this time was 183.4 pounds.  (*Id.*)  On October 12, 2006,
23 notes indicate Stelzl was "falling back into her old habits of
24 snacking and not having insulin for this."  (A.R. 377)  Stelzl was
25 walking on a treadmill regularly in the evenings.  Her current
26 weight was 182.2 pounds.  P.A. Nelson reminded her to pay close
27 attention to her diet and insulin dosing.  (*Id.*)
28

1    On November 2, 2006, Stelzl saw Dr. Gordon for followup.
2 Stelzl was taking Celexa, with no reported side effects.  She
3 reported "feeling quite well, proactively fighting off depression
4 by movement/socializing." (A.R. 291)  She was participating in
5 yoga, bowling, stamping, Asperger's group meetings, and work.  She
6 was feeling well physically, and her blood sugars were "stabilized."
7 (*Id.*)  Dr. Gordon observed that Stelzl looked "less stressed."
8 (*Id.*)  She made good eye contact, and her affect was brighter.
9 Stelzl's diagnosis was Depression NOS, "well controlled [with]
10 active [treatment]." (*Id.*)  She was directed to return in three
11 months for followup.  (*Id.*)

12    Stelzl returned to see P.A. Nelson on January 4, 2007.  She
13 reported eating quite a bit more over the holidays, and snacking
14 between meals without taking additional insulin. As a result, her
15 blood sugars had been poorly controlled.  Her current weight was 181
16 pounds.  P.A. Nelson noted that when Stelzl paid attention to her
17 diet and insulin dosing, her glycemic control was excellent, but
18 "[u]nfortunately, she frequently continue[d] to graze and snack
19 between meals without insulin," which he noted would cause "wide
20 fluctuations and significant hyperglycemia." (A.R. 378)  He
21 adjusted Stelzl's insulin dosages and ordered lab tests. (*Id.*)

22    On January 5, 2007, Stelzl saw Physical Therapist John Hamburg
23 for "chief complaints of intermittent headaches at frontal, tem-
24 poral, and parietal areas without known provocation except noise[.]"
25 (A.R. 419; *see* A.R. 429-41)  Stelzl's "referring diagnosis" was
26 "[t]horacic and paracervical strains with tension headaches," with
27 an onset date of August 1, 2006. (*Id.*)  Her physical therapy goals
28 were to reduce the intensity of her headaches by 50%, and improve

25 - FINDINGS & RECOMMENDATION

1    relaxation of the muscles of her upper cervical spine.  She was
2    treated with "[g]entle cervical and occipital mobilization," and
3    related manipulations and flexibility exercises. (*Id.*) Stelzl was
4    seen twice more, and was discharged from physical therapy on
5    January 31, 2007.  She reported "good relief of neck pain and head-
6    aches," with "full and comfortable" range of motion in her cervical
7    and thoracic spine.  (A.R. 417)

8       Stelzl saw Dr. Gordon on February 1, 2007, for followup.
9    Stelzl reported good sleep and appetite.  Her energy level was
10   "moderate." She was still working, and was "socializing regularly."
11   (A.R. 290) Stelzl had no physical complaints, no mood extremes, and
12   minimal anxiety, and she stated, "I feel great." (*Id.*)  She was
13   encouraged to get more exercise, and to return in six months for
14   followup, or as needed.  (*Id.*)

15      On April 3, 2007, Stelzl saw P.A. Nelson for followup.  Stelzl
16   was improving in her "carb recognition skills" and insulin manage-
17   ment.  Stelzl had not been exercising, but still had lost weight due
18   to better diet control, with her current weight at 174 pounds. P.A.
19   Nelson estimated that about 50% of Stelzl's blood sugars were "at
20   least close to target." (A.R. 379) Stelzl committed to walking for
21   thirty minutes, five days a week, after dinner.  (*Id.*)

22      Stelzl saw P.A. Nelson on August 14, 2007.  Her blood sugars
23   continued to be quite variable, despite adhering to an insulin-to-
24   carb ratio prescribed by the dietician.  Her current weight was
25   177.4 pounds.  P.A. Nelson adjusted Stelzl's insulin dosing sche-
26   dule, and advised Stelzl to follow up with the dietician.
27   (A.R. 380) On November 6, 2007, when she saw P.A. Nelson again, her
28   weight was down slightly, to 176 pounds.  Stelzl was walking on a

26 - FINDINGS & RECOMMENDATION

1  treadmill for 20 to 30 minutes, "most days of the week." (A.R. 381)

2  Stelzl's mother accompanied her, and stated she had been helping her

3  daughter maintain the recommended insulin-to-carb ratio.  P.A.

4  Nelson opined that Stelzl's exercise now was "causing some nocturnal

5  hypoglycemia," and he adjusted her insulin dosing schedule.  He

6  commended Stelzl on her improved blood sugars and commitment to

7  exercise.  (*Id.*)

8      On December 18, 2007, Stelzl saw Neurologist Sherrie A.

9  Rawlins, M.D. for consultation regarding possible sleep apnea.

10 Stelzl stated she did not feel rested upon awakening in the morning,

11 and she was experiencing daytime fatigue and weight gain.  Her

12 current weight was 178.3 pounds.  Her mother recently had shared a

13 hotel room with Stelzl, and reported that her snoring was so loud,

14 the mother was unable to sleep. Stelzl also reported some restless

15 leg syndrome ("RLS") symptoms, and noted other family members

16 (mother, aunt, cousins) also had RLS.  Stelzl had tried Neurontin

17 for the RLS symptoms in the past, without results.  Stelzl also

18 reported a history of migraine headaches, but stated these were not

19 bothering her currently.  The doctor scheduled Stelzl for a

20 diagnostic polysomnogram to evaluate her for a CPAP, with a repeat

21 test to be scheduled after she started the CPAP.  Dr. Rawlins

22 advised that RLS often is associated with low iron levels, so a

23 blood test was ordered to check Stelzl's iron level. (A.R. 257-60)

24     Stelzl underwent a full polysomnogram (sleep study) on Decem-

25 ber 28, 2007.  The test revealed "evidence of mild obstructive sleep

26 disordered breathing," primarily during REM sleep. (A.R. 411)  In

27 addition, Stelzl exhibited "prominent and excessive leg movements,"

28

1  for which "a low-dose dopamine agonist" was recommended. (*Id.*)
2  Stelzl was scheduled for a repeat study with a CPAP. (*Id.*)

3      On January 8, 2008, Stelzl saw Scalisi for followup and nutri-
4  tion counseling. (A.R. 255-56) Stelzl's blood sugars during the
5  previous week varied from 80 to 333 at various times of the day.
6  Her weight was down a pound-and-a-half. Stelzl's goal was to
7  increase her activity level again." (A.R. 256) The dietician
8  reviewed Stelzl's "correction scale" for insulin dosage. (*Id.*)

9      Stelzl underwent a polysomnogram with CPAP on January 25, 2008.
10  (A.R. 408-09) The test revealed "evidence of obstructive sleep
11  disorder breathing, which improve[d] with positive airway pressure."
12  (A.R. 409) A CPAP was prescribed. (*Id.*)

13      Stelzl saw P.A. Nelson on February 5, 2008. Her current weight
14  was 174 pounds. Her recent sleep apnea diagnosis had motivated her
15  to work on losing more weight. Her blood sugars had improved signi-
16  ficantly with her reduced caloric intake. She was instructed on how
17  to adjust her insulin dosing as necessary as she lost weight. (A.R.
18  382)

19      On February 9, 2008, Stelzl was seen in the emergency room with
20  a complaint of two days of abdominal pain, with bloating and
21  diarrhea. Lab tests and a CT scan showed appendicitis. Stelzl was
22  admitted into the hospital, and an appendectomy was performed the
23  same day. (A.R. 396-407)

24      On March 25, 2008, Stelzl saw Dr. Rawlins for followup. (A.R.
25  251-54) Her current weight was 175 pounds. Stelzl reported feeling
26  "dramatically better with the CPAP." She was sleeping much better,
27  had more energy during the day, no longer needed naps, was less
28  "grumpy," had lost a little weight, and was "much more efficient at

28 - FINDINGS & RECOMMENDATION

1 work and . . . not struggling to stay awake." (A.R. 252) Stelzl
2 still had some intermittent RLS symptoms, but they were not keeping
3 her awake at night, and she did not want to take another medication
4 for this problem.  The doctor recommended an iron supplement based
5 on Stelzl's test results, and Stelzl planned to discuss this with
6 her primary care physician.  (A.R. 254)

7      Stelzl saw P.A. Nelson on April 29, 2008.  Her current weight
8 was 175 pounds.  She reported several recent episodes of hypo-
9 glycemia in the early morning hours, and P.A. Nelson adjusted her
10 dosing schedule.  (A.R. 383)

11      On May 6, 2008, Stelzl saw Scalisi for followup.  Stelzl had
12 lost four pounds since January 2008, and was "working on controlling
13 her portion sizes and slightly increasing her activity." (A.R. 250)
14 She was doing some bowling, and had a plan to reduce her insulin
15 prior to planned exercise.  She was following her insulin and diet
16 plan well, and "was encouraged to just continue with her same plan
17 and follow up for support[.]" (*Id.*)

18      On May 12, 2008, Stelzl saw Dr. Rawlins for followup.  (A.R.
19 246)  Notes indicate Stelzl had received very good results from an
20 "AutoSet CPAP" trial.  She was sleeping at least seven hours a
21 night, and her daytime fatigue had resolved.  Mild RLS symptoms also
22 had resolved.  (*Id.*)

23      On August 21, 2008, Stelzl saw Dr. Gordon for followup.[4]
24 Stelzl had lost about ten pounds, and planned to lose more weight.
25 She noted her headaches and daytime sleepiness were better since she
26 had started using a CPAP.  She reported that her "mood has been

27 ───────────

28      [4]The last note prior to this one was dated eighteen months
earlier, on February 1, 2007.  (*See* A.R. 290)

29 - FINDINGS & RECOMMENDATION

1 generally good, still working 12 hours weekly, sees a movie once a
2 week with a [girlfriend], [planned] to attend Autism Camp later this
3 month, [and] still enjoys scrap-booking regularly."  (A.R. 289)
4 Notes indicate Stelzl was seeing "counselor Nan Lester" weekly, and
5 Stelzl indicated the counselor was helping her find "good people to
6 hang out with." (*Id.*)  Stelzl had been taking Celexa for several
7 years, and Dr. Gordon suggested tapering off the medication to see
8 how Stelzl responded without it.  Stelzl indicated she had "been
9 doing well for two years" with regard to her depression, and she
10 agreed to taper off of the Celexa. (*Id.*)

11      Stelzl saw Dr. Gordon for followup on October 9, 2008.  Stelzl
12 had tapered off Celexa without difficulty, noting no changes in her
13 sleep, energy, appetite, or mood.  (A.R. 288)  Stelzl complained of
14 some fatigue, but thought this could be related to a low Vitamin D
15 level, and noted she was receiving Vitamin D shots.  Stelzl was
16 doing well overall.  She was working part time, and participating
17 in "crafting" and "bowling." (*Id.*)  The doctor noted that no medica-
18 tions were indicated at this time.  (*Id.*)

19      Stelzl saw P.A. Nelson on November 6, 2008.  Her current weight
20 was 176.6 pounds.  Her blood sugars continued to vary widely.  P.A.
21 Nelson adjusted her insulin dosing schedule, and discussed when to
22 have protein snacks and other snacks.  (A.R. 384)

23      On December 18, 2008, Physical Medicine and Rehabilitation
24 specialist Martin Kehrli, M.D. reviewed the record and completed a
25 Physical Residual Functional Capacity Assessment form regarding
26 Stelzl. (A.R. 442-49) He found that a review of all of the medical
27 evidence "clearly show[ed]" Stelzl did not have any "physical
28 impairment that meets or equals a listing level for severity."

30 - FINDINGS & RECOMMENDATION

A.R. 449)  He noted Stelzl worked part time, lived alone, was independent in all of her activities of daily living; and cleaned, cooked, and shopped on her own. (A.R. 447)  He found no limitations in Stelzl's ability to perform work-related activities. (A.R. 442-49)

On December 19, 2008, clinical psychologist Bill Hennings, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (A.R. 450-63), and a Mental Residual Functional Capacity Assessment form (A.R. 464-67) regarding Stelzl. He evaluated Stelzl under Listing 12.04 - Affective Disorders ("Depression"), and Listing 12.10 - Autistic Disorder ("Asperger's disorder"). (A.R. 450, 453, 459)  Dr. Hennings opined Stelzl would have mild limita-tions in her activities of daily living, and in maintaining concen-tration, persistence, or pace; and moderate limitations in her ability to maintain social functioning. (A.R. 460)  In his notes, Dr. Hennings indicated the record contains "no evidence to suggest that [Stelzl] is psychologically incapable of sustaining simple, routine tasks." (A.R. 462)  On the more specific Mental RFC form, Dr. Hennings indicated Stelzl would have moderate limitations in her ability to understand, remember, and carry out detailed instruc-tions; interact appropriately with the general public; maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently of others. He opined she would not be limited signi-ficantly in any other way due to her mental impairments. (A.R. 464-66)

On January 6, 2009, Stelzl saw Scalisi for a review of her blood sugars and for "Diabetes Education." (A.R. 473-74)  Notes

31 - FINDINGS & RECOMMENDATION

indicate Stelzl had developed a "good understanding of carbohydrate counting," and insulin dosing in connection with physical activity. (A.R. 473)  Her weight was up to 181 pounds, and Stelzl indicated she would get back to using her treadmill in the evenings. (A.R. 474)

Stelzl saw P.A. Nelson on January 15, 2009. Stelzl had started exercising more regularly, and her blood sugars were "markedly improved" with a recent medication change. An additional medication was added to her regimen to increase control of her blood sugars. (A.R. 476)

On January 25, 2009, Stelzl and her mother had an introductory session with counselor Lola Broomberg, M.S. Broomberg noted Stelzl used jerky language, showed "little facial affect," and her speech was rambling and unfocused. (A.R. 513) Stelzl's intellectual functioning and judgment were impaired, and her thought content was circular. Broomberg noted Stelzl had a low level of functioning. Stelzl's mother indicated her daughter repeatedly had made "unsafe relational and personal decisions." (*Id.*) Stelzl indicated she was "interested in being independent," but Broomberg noted, "She may not be able to be as independent as she would like and may not understand possible limitations." (*Id.*)

Stelzl saw counselor Broomberg on February 5, 2009. Stelzl's conversation was "halting," and she appeared "shy and uncertain of the direction that she wants her treatment to take." (A.R. 514) Her thought content was "simple and repetitive," and she exhibited "[s]ome compulsive thinking." (*Id.*) Broomberg noted Stelzl sometimes had to be interrupted to break her circular attention pattern. (*Id.*)

32 - FINDINGS & RECOMMENDATION

On February 10, 2009, Stelzl saw Dr. Gordon for followup. Stelzl reported "recently increased sleep, anergia, low motivation to pursue interests, dysphoria including recent [symptoms] of wanting to jump off roo[f], sit in car with gas on . . . no reason to live, just want to die'." (A.R. 488)  Stelzl indicated these symptoms of depression had been more intense over the last few months.  Physically, her blood sugars were very good, and she was walking regularly.  Under "Recent stressor," the doctor noted: "economy and 'job on the line', believes she may be laid off soon, considering returning to school to become dental hygienist, 'new X-BF'." (*Id.*)  Dr. Gordon noted Stelzl appeared pleasant, articulate, and well groomed.  She expressed herself logically, and her thought processes were coherent.  The doctor opined Stelzl's recent depression was due to upset from breaking up with her boyfriend.  She prescribed Lexapro 10 mg. daily.  (*Id.*)

Stelzl saw counselor Broomberg on February 13, 2009.  Stelzl described her current status as "[f]earful, anxious and depressed," and Broomberg noted Stelzl "appear[ed] anxious about her life and her relationships," and "about cleanliness and germs . . .[and] future independence." (A.R. 515)  Stelzl lacked focus about her career path, and was concerned that she could not take care of herself financially. Her speech was "[f]lat, jerky and repetitive," and she seemed "unable to distinguish between possible career paths and what is and is not possible for her." (A.R. 515-16)

On February 27, 2009, Stelzl saw counselor Broomberg again.  Stelzl was reluctant to rejoin her bowling team because she feared "running into ex-partners." (A.R. 516)  Her affect was flat, and her thought content was "repetitive and obsessive." (*Id.*)

33 - FINDINGS & RECOMMENDATION

Stelzl saw Dr. Gordon on March 3, 2009, and reported feeling much better on the Lexapro.  She had plans to enroll at Lane Community College for the spring term.  Her affect was "[s]lightly brighter," and she reported feeling more energetic.  (A.R. 488)

Stelzl saw counselor Broomberg on March 13, 2009.  Her level of functioning was unchanged, and she reported being slightly depressed.  Her affect and speech mode were flat.  (A.R. 517-18)  Stelzl was more relaxed at her next session, on April 7, 2009.  Her affect was neutral, but she was more present in the conversation.  (A.R. 518-19)

On April 15, 2009, psychologist Joshua J. Boyd, Psy.D. reviewed the record and completed a Mental Summary in connection with Stelzl's request for reconsideration.  He noted Stelzl had described her activities of daily living "as quite active, well rounded and intact."  (A.R. 477)  He found Stelzl had "remained very stable mentally"; was able to sustain social activities and friendships; and although she was not working at the substantial gainful activity level, she had been "able to sustain work activity."  (*Id.*)  He affirmed the December 2008 Mental RFC.  (*Id.*)

On April 17, 2009, Sharon B. Eder, M.D. reviewed the record and completed a Physical Summary.  She noted Stelzl was working part time as a file clerk.  She indicated Stelzl had "long standing diabetes with variable control, but no signs of end organ damage . . . neuropathy, etc."  (A.R. 478)  She found Stelzl's diabetes would cause some reduction in Stelzl's residual functional capacity, but she affirmed the December 2008 Physical RFC.  (*Id.*)

Stelzl saw counselor Broomberg on April 21, May 4, June 3, and June 18, 2009.  She continued to be anxious about her finances and

34 - FINDINGS & RECOMMENDATION

1  career possibilities, and how she could create an independent life

2  for herself.  She also continued to be reluctant to engage in social

3  interactions.  However, her affect and level of functioning improved

4  somewhat during this period of time.  (A.R. 519-23)

5      Stelzl saw Dr. Gordon on June 23, 2009.  She reported "feeling

6  generally well with good sleep, appetite and energy level." (A.R.

7  487)  She had no physical complaints, had lost some weight, and

8  stated her diabetes was well controlled.  Stelzl indicated she was

9  "looking into possible vocations," and had visited the community

10 college's career center, but her "family members' opinions about

11 what work she is best suited for both help[ed] and hinder[ed] her

12 process." (*Id.*)  Dr. Gordon suggested Stelzl take her mother with

13 her to talk with a career counselor at the community college.

14 (*Id.*)

15     Stelzl saw counselor Broomberg on July 7, 2009.  Stelzl had

16 exacerbated anxiety due to personal relationships with two men, and

17 "[c]oncern about independence and traveling to be with family in

18 Montana later in the summer." (A.R. 523)  Her affect was "neutral

19 and flat," and her intellectual functioning was "fair."  (*Id.*)

20     Stelzl returned to see Dr. Gordon on July 14, 2009.  Stelzl had

21 begun working with Nan Lester, an Asperger's therapist who also

22 acted as an "educational advisor" and "disability advocate" on

23 behalf of individuals with autism and Asperger's syndrome. (*See*

24 A.R. 489)  Stelzl also was seeing Broomberg every three weeks.

25 Stelzl indicated her mood had been good, and she reported no

26 physical concerns or complaints.  (A.R. 486)

27     Stelzl saw counselor Broomberg on July 29, August 26, and

28 September 9, 2009.  Stelzl's mental status was variable.  At times,

35 - FINDINGS & RECOMMENDATION

1 she was anxious about interpersonal relationships, and her ability
2 to live independently and care for herself.  At other times, she
3 appeared happy, stable, and content.  (A.R. 524-26)

4     On October 13, 2009, Stelzl saw Dr. Gordon for followup.
5 Stelzl reported good sleep, appetite, energy, and mood.  She was not
6 socializing much, and still was working twelve hours per week at the
7 same job.  Stelzl had been to a workshop at the community college,
8 and had received job recommendations including "proof reading, movie
9 critic, census bureau, voter registration office, cooking prep."
10 (A.R. 485)  She was still working with Broomberg every week or two.
11 Dr. Gordon noted Stelzl was "[s]table appearing and benefitting from
12 medication."  (*Id.*)

13     Stelzl saw counselor Broomberg on October 21, 2009.  Stelzl was
14 anxious and overwhelmed, with "[s]lightly impaired" intellectual
15 functioning.  (A.R. 527)  On November 4, 2009, she was "[e]xtremely
16 anxious," with thought content that was "driven by anxiety, [and]
17 not grounded in realistic steps toward goal setting or planning."
18 (A.R. 528)  Stelzl remained anxious on December 6, 2009, but also
19 was excited about the upcoming holidays.  (A.R. 528-29)

20     Stelzl saw Dr. Gordon on January 11, 2010.  She reported a
21 lower energy level and more lethargy.  Her mood had been more
22 depressed for a few weeks, but not severely.  Stelzl was attending
23 church regularly, and had been in a Christmas play.  She was still
24 doing part-time office work, and was not seeking other employment
25 at this time.  She was still seeing Broomberg, and stated she found
26 this "quite useful in helping her organize her activities and think
27 about relationships."  (A.R. 484)  Dr. Gordon noted Stelzl's affect
28 was "slightly flat and constricted," and she was "[a] little less

jocular today but with some appropriate smiles." (*Id.*)  She opined
Stelzl likely was struggling with mild Seasonal Affective Disorder.
She increased Stelzl's Lexapro to 20 mg. daily, and encouraged
Stelzl to get out and exercise.  (*Id.*)

On January 15, 2010, Stelzl returned to see counselor Broom-
berg.  Stelzl stated she was "[h]appy and mellow," and Broomberg
assessed Stelzl as "stable."  (A.R. 529-30)

On February 9, 2010, Dr. Gordon wrote an opinion letter
regarding Stelzl's mental RFC.  She indicated "Stelzl meets DSMIV
criteria for Mood Disorder Not Otherwise Specified, and Pervasive
Developmental Disorder Not Otherwise Specified."  (A.R. 483)
Dr. Gordon stated she had worked with Stelzl intermittently for
about six years.  She indicated, "[I]t is clear to me [Stelzl] is
not able to obtain further employment or pursue vocational training
at this time in part due to the above diagnostic problems she
struggles with." (*Id.*)  Dr. Gordon noted that Nan Lester in her
office, who is a Pervasive Developmental Disorder Specialist, had
been working with Stelzl "in seeking disability services," and
Lester would be "in a much better position" than Dr. Gordon for
purposes of providing an estimate of Stelzl's mental RFC.  (*Id.*)

Stelzl saw counselor Broomberg on February 11, 2010.  She had
a flat affect and "slightly impaired" intellectual functioning,
although Stelzl described herself as "Fine."  (A.R. 530)

On February 25, 2010, therapist Nan Lester wrote an opinion
letter to the state agency, in which she opined that Stelzl needs
"continuous treatment, and SSDI." (A.R. 489)  Lester stated Stelzl
has an "extremely limited ability to perceive the intentions and
motivations of others, and therefore to respond accordingly as

1 others capable of protecting themselves are." (A.R. 489-90)

2 Lester further stated:

> In my observation, despite unrelenting efforts
> on both my, her Mother, and my associates part,
> we have witnessed nothing but a continuation,
> if not always an escalation of, [Stelzl's]
> destructive, mal-adaptive, and dangerous beha-
> viors, as well as the "avoidant, blaming, and
> shutdown" afterward.
>
> It is my considered opinion that [Stelzl] will
> not likely survive access to a safe, meaningful
> life, with all the dignity and resources she
> deserves, with[out] first obtaining SSDI, and
> the supervising professional expertise that
> disburses the much needed funding.

(A.R. 490)

Lester completed a Mental RFC form, opining that Stelzl has moderate limitations in her ability to remember locations and work-like procedures; understand and remember short, simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; interact with the general public; ask simple questions and request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. She opined Stelzl has moderately severe limitations in her ability to understand and remember detailed instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. She

opined Stelzl has <u>severe limitations</u> in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal work day and work week without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and set realistic goals or make plans independently of others.  (A.R. 492-94)

In her comments, Lester indicated that although Stelzl does not meet "the cognitive verbal or performance requirements for Axis II Mental Retardation," she nevertheless experiences severe deficits in the areas of functioning related to organization, multi-tasking, retention, perceiving consequences, projecting outcomes, and the like. (A.R. 494)  She further indicated Stelzl is severely limited in the area of "social cognition." (A.R. 494-95)  Lester indicated that despite years of therapy, both individually and in a group setting, Stelzl remains "impaired to a degree where her risk factors far outweigh any capacity to function independently."  (A.R. 495)[5]

Stelzl saw counselor Broomberg on February 28, 2010.  Stelzl was considering starting a business and was "[g]etting [o]rganized." (A.R. 531)

---

[5]Accompanying Lester's opinion letter and mental RFC form is a statement from "Christopher Hawke, B.S., C.R.P.," of "Asperger Counseling N.W.," offering his observations of Stelzl during an autism support group she attended.  (*See* A.R. 496-97)  The record contains nothing about Hawke's qualifications, or any personal interactions he may have had with Stelzl, and "Asperger Counseling N.W." does not appear to be a functioning organization presently. The ALJ did not discuss Hawke's observations, and the parties have not referenced his opinions in their briefs.  Similarly, the court will not credit Hawke's observations in this review.

39 - FINDINGS & RECOMMENDATION

On April 1, 2010, Stelzl underwent a neuropsychological evalu-ation by William A. McConochie, Ph.D., on referral from the state agency. (A.R. 501-12) Stelzl drove herself to the appointment. She was noted to be friendly, cooperative, and appropriately dressed and groomed. Her evaluation results were considered reliable and valid. (A.R. 502) In discussing her history with Dr. McConochie, Stelzl indicated she thought "she might be able to work as a nursing home assistant at present and up to 40 hours per week," as long as the job was "not too complicated," and did not require heavy lifting. (A.R. 503) Testing administered by an intern in the doctor's office showed Stelzl has a full-scale IQ of 80, and func-tions "in the mid-average range in verbal intelligence," but her processing speed is "in the borderline range [which] could be expected to limit her ability in jobs such as she has held as a file clerk and doing odd jobs in a nursing home." (A.R. 505-06) Her memory functioning was in the average range. She was notably slow at visual attention and task switching, and "was confused when told to place her left hand to her left elbow, not seeming to understand that this was an impossible task." (A.R. 506) Based on his evaluation, Dr. McConochie opined Stelzl has no clinical Axis I diagnosis. He noted, "While she has a history of Aspergers syndrome and depression, she does not seem to have clear and debilitating symptoms of these syndromes at present. Her medications seem to help adequately, as with depression." (*Id.*) He further stated Stelzl's "primary psychological limitations to work activity are a combination of various areas of difficulty, none of which rises to the level of a clinical syndrome, in the present examiner's opinion." (A.R. 507-08)

40 - FINDINGS & RECOMMENDATION

1     Regarding Stelzl's mental functional work-related abilities,
2  Dr. McConochie opined she would be <u>mildly limited</u> in her ability to
3  carry out simple instructions, make judgments on simple work-related
4  decisions, and interact appropriately with supervisors and co-
5  workers.  He opined she would be <u>moderately limited</u> in her ability
6  to understand, remember, and carry out complex instructions; inter-
7  act appropriately with the public; and respond appropriately to
8  usual work situations and to changes in a routine work setting.
9  (A.R. 510-11)  The doctor indicated Stelzl's "[o]verall ability to
10 support herself has been marginal."  (A.R. 511)  She is dependent
11 on her family and local charities for subsistence. (A.R. 507, 511)
12 Dr. McConochie opined that Stelzl's limitations likely originated
13 in childhood, and are "probably congenital in nature," such that
14 there is a poor prognosis for any change in her limitations.  (A.R.
15 508, 511) He indicated she "would need assistance managing signifi-
16 cant amounts of income."  (A.R. 508)[6]

17     On April 10, 2010, Stelzl saw counselor Broomberg.  Stelzl had
18 started her own business as an in-home care provider, and she was
19 happy and excited about this.  However, Broomberg felt Stelzl

_____

21     [6]Dr. McConochie's recitation of the background "Referral
information" regarding Stelzl contains several inaccuracies. (*See*
22 A.R. 501-02)  For example, he indicates Nan Lester's report is
"dated October 25, 2010" (which is six months *after* Dr.
23 McConochie's evaluation), when the report actually is dated
February 25, 2010.  He stated Stelzl's treatment notes indicated
24 Dr. Gordon had "recommended a job possibly as a proofreader, movie
critic, Census bureau worker or a worker as a clerk in a voter
25 registration office." (A.R. 501)  These job recommendations were
not made by Dr. Gordon; rather, Stelzl reported to Dr. Gordon that
26 those jobs had been mentioned as possibilities by someone at a
community college workshop. (*See* A.R. 499)  Stelzl's mother noted
27 additional inaccuracies in her hearing testimony. (*See* A.R. 57-60)
However, the court finds, as did the ALJ, that these inaccuracies
28 had no impact on Dr. McConochie's findings.

41 - FINDINGS & RECOMMENDATION

1  "seem[ed] challenged to follow through with marketing or planning
2  the details required to do the work." (A.R. 532)  She noted a
3  concern that Stelzl "might be taken advantage of because of her good
4  nature and her unwillingness to set limits." (*Id.*)  Broomberg
5  counseled Stelzl in developing a business plan and strategy.  She
6  noted Stelzl's "desire for financial independence may camouflage
7  some of her cognitive challenges[.]" (*Id.*)

8      Stelzl saw counselor Broomberg on May 20, 2010.  Treatment
9  notes do not indicate what had occurred with regard to Stelzl's
10 attempt to start a home-based business.  Notes indicate Stelzl was
11 "having a tough time finding a job or knowing what she could do."
12 (A.R. 533) Broomberg noted Stelzl "seem[ed] disengaged from realis-
13 tic thinking in terms of her capacities or follow through with
14 regard [to] career development." (*Id.*)  On June 2, 2010, Stelzl was
15 noted to be frustrated due to her parents' over-protectiveness.
16 Stelzl questioned whether her upcoming Social Security hearing was
17 necessary.  Broomberg noted, "[Stelzl] would like to believe that
18 she could be able to support herself financially and with her life
19 choices.  Though her desire for independence is clear and driven,
20 as her therapist I question her capacity to manage an independent
21 life without support.  She is easily overwhelmed, is challenged by
22 personal organization and is limited in terms of her scope of
23 focus." (A.R. 534)  She noted Stelzl's thinking could become
24 circular when Stelzl was agitated.  (*Id.*)
25  / /
26  / /
27  / /
28

42 - FINDINGS & RECOMMENDATION

### B.  *Stelzl's Testimony*

**1.  *Hearing testimony***

At the time of the hearing, Stelzl was 39+ years old.  She is a high school graduate, and earned an Associate's degree in Liberal Studies.  She stated she did not receive any special accommodations while she earned her degree, but it took her six years to earn the degree.[7]  She went to school "sort of" full time, but for the first year-and-a-half or two years, she was undecided about her major. (A.R. 37)

Stelzl stated she has lived independently "[s]ince college which would have been . . . 1990." (A.R. 38)  Since January 2003, she has worked twelve hours per week at Bell Real Estate.[8]  She also works four hours every other week "doing elder care and house-cleaning." (*Id.*)  At one time, she trained for a job doing telephone surveys, but she only worked at the job for about two days because she found it too stressful. (A.R. 38-39)  From September 1995 to around April 2000, she worked part time as a kitchen helper at a rehabilitation center, earning minimum wage.  She indicated she might have been able to work full time at the facility if a position had been available.  She stated she left the job because she did not feel safe at the facility. (A.R. 39-41)  She worked for about a week as a switchboard operator at an auto dealership, but left because the job was "more than [she] could handle." (A.R. 47-48)  She had

---

[7]Stelzl's mother, however, testified Stelzl was given extra time to take tests. (*See* A.R. 58)

[8]The ALJ indicated Stelzl's past work had not been at the substantial gainful activity level, but because Stelzl had been at the real estate job for so long, the ALJ was "going to consider it past relevant work." (A.R. 40)

43 - FINDINGS & RECOMMENDATION

1  to use a computer, and there were a lot of buttons and extensions,
2  as well as dealing with walk-in customers.  She took notes and tried
3  to remember what to do, but it was overwhelming and too difficult
4  for her.  (A.R. 49-50)

5      Stelzl stated she only does filing at the real estate office.
6  She "used to do the phones but it was too much multi-tasking," which
7  she was unable to handle.  (A.R. 44; *see* A.R. 50-51)  She files
8  papers, and puts "keys from the key box into the . . . correct
9  folder."  (*Id.*)  She has never received a raise at the job, and has
10 always worked only twelve hours a week.  At one point, she asked for
11 more hours, but the office did not need her more than the twelve
12 hours a week.  (A.R. 51-52)  At her elder care job, she makes
13 breakfast for her clients, feeds their animals, cleans litter boxes
14 and takes dogs outdoors, and does general housecleaning, including
15 sweeping, mopping, vacuuming, and changing linens.  (A.R. 45)  She
16 was continuing to look for other part-time work, but had not found
17 anything.  (A.R. 52)  She stated she enjoys "working with color and
18 design," and thought about becoming an interior decorator, but she
19 felt that "Eugene, Oregon, is not really the place where they would
20 actually hire somebody as an interior decorator."  (*Id.*)

21     Stelzl stated that at the time of the ALJ hearing, she was
22 taking low-dose aspirin four times daily, Accupril (a blood pressure
23 medication), Simvastatin (for high cholesterol), Zoloft (an
24 antidepressant), and Symlin (used as an adjunct to insulin therapy
25 for Type I diabetics).[9]  She stated she has problems regulating her
26 blood sugars.  When her blood sugar is too high, her vision gets

27 ────────────

28     [9]*See* www.rxlist.com.

44 - FINDINGS & RECOMMENDATION

blurry, and when it is too low, she gets confused and disoriented. She has to prick her fingers several times a day, so her fingers often hurt, and she takes insulin shots eight times a day, often causing bruises. (A.R. 42-43)

Stelzl stated she is unable to work full-time due to her diabetes. She might do really well one day, and not well the next. In addition, she is bothered by loud noises, especially high-pitched noises like an ambulance siren. (A.R. 43-44)

For entertainment, Stelzl enjoys bowling. She was in a league for a couple of years, but was not in a league at the time of the hearing. She spends several hours a week with a girlfriend doing scrapbooking and making greeting cards. She does her own grocery shopping about once a week. She drives a car, and does her own housekeeping. (A.R. 44-45. 52) She has checking and savings accounts, but has difficulty keeping track of her funds to prevent overdrafts. She stated her account had been overdrawn four or five times during the previous year. (A.R. 45-46) She receives food stamps, and her parents provide her with substantial financial support. (A.R. 46)

Stelzl estimated she could not lift more than ten pounds comfortably because she has "back issues." (*Id.*) She "pulled some-thing" in her back when she was working at the rehab facility. She took pain and anti-inflammatory medications for awhile, and received chiropractic treatments, but her back continues to bother her. (*Id.*) Her only exercise is housecleaning, which she stated is "definitely exercise." (A.R. 47)

Stelzl stated she can sit for 15 to 30 minutes at a time before she gets stiff. If she gets up and walks around for about 15

45 - FINDINGS & RECOMMENDATION

minutes, she can sit back down.  She stated she has "really no issues right now with standing." (*Id.*)  She can "probably walk [for] well over an hour." (*Id.*)  She sometimes has problems using her hands because she gets wrist pain, which makes it difficult to use the restroom, bathe, brush her hair, and things involving "those little muscles and things in your wrist[.]" (A.R. 48)  The wrist pain is not constant, and she has not mentioned it to her doctor. (*Id.*)  In addition, her fingers sometimes get numb.  (*Id.*)

Stelzl indicated she was diagnosed with sleep apnea in December 2008, which explained her "extreme exhaustion for pretty much . . . many years[.]" (A.R. 53)  She stated a CPAP has been helpful for her, but she sometimes forgets to take the cord with her when she goes on vacation or to visit someone.  At home, she uses the CPAP every night.  (A.R. 53)  She no longer requires a nap during the day.  (A.R. 48)

Stelzl stated she has migraine headaches, which occur a couple of times a year.  Stress and holidays can cause her to have a migraine.  She can usually "take two aspirin and . . . sleep it off." (A.R. 54)  She stated she has a lot of stress in her life around trying to find a job, support herself, and make ends meet. She wants to be independent from her parents, and she worries about money a lot, which is exhausting and makes her feel depressed. (*Id.*)

Stelzl stated she received vocational rehabilitation services at one time.  She took a typing class, and worked as a volunteer at DHS for about six months, but never could find a paying job. (A.R. 55)

46 - FINDINGS & RECOMMENDATION

2.    *Written testimony*

On December 5, 2008, Stelzl completed a function report, describing how her impairments limit her activities. (A.R. 175-82) Stelzl described her daily activities as follows:

> Work day: get up, take blood test & insulin, eat breakfast, feed cats, get dressed, drive to work, work 4 hours[,] take blood test & insulin, eat lunch, go home, get mail from mailbox, check phone messages, watch TV, sometimes I run errands, scrapbook pictures for photo album, take blood test/insulin[,] make dinner & eat it, watch TV, check e-mail, talk on phone[,] take blood test/insulin then go to bed.

(A.R. 175) Stelzl lives alone with three cats that she cares for herself. She has no problems with her personal care. Her sleep sometimes is affected by sleep apnea, back pain, and migraine headaches. (A.R. 176) She does not need reminders to take her medications, or to care for herself. She prepares her own meals daily, weighing and calculating her carbohydrate intake. She does household chores and yard work without assistance, and these chores take her about three hours a week. (A.R. 177) She gets out of the house daily, and drives herself wherever she needs to go. She does her own shopping for groceries, prescriptions, and scrapbooking supplies. She pays her own bills and uses a checkbook.[10] (A.R. 178)

Stelzl indicated her file clerk job requires her to do the following during her work day: lift no more than ten pounds, walk for about one hour, stand for one hour, sit for two hours, and stoop

---

[10]*But see* A.R. 186-87, Leslie Stelzl's testimony regarding Stelzl's ability to manage her money and keep her checkbook balanced.

47 - FINDINGS & RECOMMENDATION

1  for about half an hour.  Her job duties include using a Pitney Bowes

2  postage machine, folding and stuffing envelopes, and general filing.

3  (A.R. 179)

4

5                    **C.   Third-Party Testimony**

6  **1.   Leslie Stelzl's hearing testimony**

7       Stelzl's mother Leslie Stelzl ("Leslie") testified at the

8  hearing.[11]  Leslie indicated there had not been any significant

9  changes in Stelzl's functioning, or the assistance provided to

10 Stelzl by her parents, since the third-party function report Leslie

11 completed in 2008.[12]  (A.R. 56)

12      Leslie stated she had reviewed Dr. McConochie's report, and it

13 contains several inaccuracies.  First, the report states Stelzl has

14 Type II diabetes, when she actually has Type I.  Leslie stated

15 Stelzl "has not been in good control virtually since she was diag-

16 nosed at age 15.  She has a lot of trouble feeling highs and lows

17 and she has actually passed out at [a] volunteer job[] for more than

18 four hours and not been found."  (A.R. 57)  Leslie also got a call

19 from an employment agency once when Stelzl was there looking for

20 jobs, "and the man who was interviewing her was in a panic because

21 she was beginning to pass out[.]"  (*Id.*)

22      Leslie stated Stelzl went into a diabetic coma once, in 1997,

23 and was in intensive care.  The ALJ explained that 1997 was well

24 beyond the time frame being considered in this case.  The ALJ stated

25  _____

26      [11]Stelzl left the hearing room while her mother testified.
   (A.R. 55)

27

28      [12]The third-party function report Leslie completed in 2008 is
   discussed in the next section of this opinion.

48 - FINDINGS & RECOMMENDATION

1 she alleges 1971, but the farthest back we could go to pay benefits

2 would be October of 2007.  So that's the timeframe we're interested

3 in."  (*Id.*)

4     Returning to Dr. McConochie's report, Leslie noted the

5 following additional inaccuracies:

> Page 2 it states that she was tested in 1995
> when she was six years old.  She would have
> been 24 at that time.  It also states that she
> drove herself to this appointment.  No she
> didn't, I took her. At the bottom of that page
> the background information suggests this diag-
> nosis of Asperger's was made in childhood and
> it was not.  She was about 33 years old.  On
> page 3 it says that from the sixth grade she
> was given extra help, otherwise she did fine.
> She actually was in a special school within a
> school and from age first grade on she had a
> private tutor, [and] she was in a special
> resource room.  She has throughout her life
> always had counseling, tutoring, special
> classes.

15 (A.R. 57-58)  Leslie stated that although Stelzl obtained a two-year

16 degree, she was given extra time to take tests, and it took her "six

17 years to do all but one class."  (A.R. 58)

18     Leslie noted that on page 4 of Dr. McConochie's report, he

19 states something about her headaches.  Her headaches aren't just

20 headaches, they're migraines.  They totally incapacitate her to the

21 point of vomiting."  (A.R. 59)  According to Leslie, her daughter's

22 migraines occur whenever she is "under a lot of stress or anxiety."

23 (*Id.*)  She indicated Stelzl's migraines occur "at a minimum twice

24 a year."  (*Id.*)  The report also indicates Stelzl is not "in

25 excessive debt and that she can manage money."  (A.R. 60)  Leslie

26 stated that was incorrect, indicating she has "bailed [Stelzl] out"

27 more times than she could count.  Leslie has covered $10,000 to

28 $12,000 that was run up on Stelzl's credit card when Stelzl was

49 - FINDINGS & RECOMMENDATION

1  married to "an inappropriate husband." (*Id.*)  Leslie pays Stelzl's

2  medical bills and prescription bills, and gives Stelzl a weekly

3  allowance.  (*Id.*)  She stated Stelzl recently incurred a $2,500

4  veterinarian bill for "sick cats." (*Id.*)  "On a continuing basis,

5  probably five times a year, [Leslie makes] good sized payments on

6  credit card bills that [Stelzl] has racked up."  (A.R. 61)

7      Besides providing Stelzl financial assistance, Leslie also

8  helps guide Stelzl in managing her diabetes, managing her time to

9  prevent stress and anxiety, helping her "organize and accomplish

10 things," reminding her of doctor and dental appointments, and trying

11 to budget her money.  (A.R. 60, 61)

12     Leslie opined Stelzl probably could work more than twelve hours

13 per week, but, in Leslie's opinion, "she could not handle a full-

14 time job."  (A.R. 62)  According to Leslie, the "stress and the

15 anxiety" from a full-time job would cause Stelzl to have migraines.

16 In addition, if she worked full time, Stelzl would not be able to

17 see her nutritionist and endocrinologist as often as needed. (*Id.*)

18     According to Leslie, Stelzl's father subsidizes her salary at

19 the real estate office.  Stelzl makes $10.00 an hour, of which her

20 father pays $4.00.  (A.R. 63; *see* A.R. 226)  Leslie acknowledged

21 that Stelzl is doing well as far as her work, living alone, driving,

22 and hobbies.  (A.R. 65)  But Leslie reiterated her belief that

23 Stelzl would be unable to work full time.  She stated, "[T]he stress

24 and the anxiety of having a full-time job would trigger the

25 migraines to the point where she would just be incapable of func-

26 tioning.  And that starts off a chain reaction.  The migraine is so

27 painful [and] then goes into vomiting, then goes into an insulin

28 overload and if that gets to a degree then she's hospitalized. She

50 - FINDINGS & RECOMMENDATION

1 can't keep down food."  (A.R. 66)  She stated Stelzl is "easily

2 overwhelmed," and "has ver poor judgment as far as people. . . .

3 There are a lot of safety issues involved with this girl."  (A.R.

4 66-67)

5

6 **2.  *Leslie Stelzl's written testimony***

7    On December 5, 2008, Leslie completed a third-party function

8 report regarding her daughter.  (A.R. 183-91)  Leslie stated Stelzl

9 works three days a week for four hours each day.  Stelzl watches TV,

10 scrapbooks, cleans, does yard work (raking and sweeping), runs

11 errands, and cares for her cats.  She feeds her cats, and obtains

12 veterinary services for them as required.  Leslie indicated she

13 helps Stelzl financially when necessary.  (A.R. 183-84)  According

14 to Leslie, Stelzl's sleep is affected by headaches that are "so

15 severe [she] can't sleep."  (A.R. 184)  Stelzl also has sleep apnea

16 that "prevents sound restful sleep," and "back episodes [that] cause

17 pain severe enough to affect rest & sleep."  (*Id.*)

18    Leslie indicated Stelzl has no problems with her personal care,

19 and does not need reminders to care for her personal hygiene and

20 grooming.  Leslie stated Stelzl sometimes requires assistance with

21 her insulin, and when she has a severe migraine and "can't keep down

22 food."  (A.R. 185)  She indicated Stelzl does her own cooking each

23 day, and her own household chores and yard work.  Leslie stated she

24 sometimes assists Stelzl in cleaning her house, and Stelzl sometimes

25 needs "verbal encouragement" to keep her house clean.  (*Id.*)  Leslie

26 indicated Stelzl drives when she goes out, and does her own shopping

27 for groceries and scrapbooking materials.  According to Leslie,

28 Stelzl has problems with overdrawing her checking account, so Stelzl

1  uses money orders to pay the bills she can or she uses cash."

2  (A.R. 186)  She indicated Stelzl "has NEVER been able to manage

3  money."  (A.R. 187; emphasis in original)

4      Leslie indicated Stelzl "bowls in a disabled league," goes to

5  church on Sundays, and scrapbooks with an autistic friend.  She

6  stated Stelzl enjoys "watching TV, scrapbooking, listening to music,

7  bowling, [and] seeing movies."  (*Id.*)  According to Leslie, Stelzl

8  has problems communicating clearly, and this "social deficit makes

9  some events very difficult for her, particularly when [in] large

10  groups."  (A.R. 188)  Leslie indicated Stelzl has problems with

11  lifting and bending due to a "chronic back problem."  (*Id.*)  She

12  indicated Stelzl does not handle stress well, avoiding "issues until

13  she melts down," and getting "very severe" migraines due to stress.

14  (A.R. 189)  She indicated changes in routine are difficult for

15  Stelzl, but Stelzl "usually does okay" if she has "plenty of

16  warning" prior to a change in routine.  (*Id.*)  Leslie stated her

17  daughter is "obsessive compulsive re locking doors, checking range

18  top, car doors, checking watch for time.  Great fear of being

19  wrong'."  (*Id.*)

20      Regarding Stelzl's ability to concentrate, and to understand

21  verbal instructions, Leslie stated: "She can focus on TV, scrap-

22  booking for long periods of time.  Instructions & explanations on

23  topics not of interest, her attention span is very limited.  I

24  suspect mostly because she's not understanding.  She does not

25  multitask and cannot follow long or complex instructions."  (A.R.

26  190)  She indicated Stelzl can finish a movie, but when it comes to

27  completing chores, Stelzl gets distracted frequently.  (*Id.*)  She

28  indicated Stelzl does better with written instructions than with

52 - FINDINGS & RECOMMENDATION

1  verbal ones, but she does not do well if instructions are more than

2  three steps.  (A.R. 188)

3

4  **3.   Statement from Stelzl's Supervisor**

5      Amanda Tuski, General Manager of Bell Real Estate, wrote a

6  letter dated September 9, 2010.  Tuski stated Stelzl had worked in

7  the office as a file clerk since January 2003.  She noted Stelzl did

8  her job well, but "the scope of her tasks [was] very limited."

9  (A.R. 230)  Tuski indicated they had tried to give Stelzl additional

10 tasks from time to time, but she was unable to perform the tasks

11 adequately.  Tuski went on to state as follows:

12          If we had enough work to warrant a full-time
           file clerk, we would not hire [Stelzl].  It is
13          my belief that [Stelzl] is working to her full
           capacity at 12 hours per week.  She seems
14          really ready to go after her 4-hour shift.  I
           do not think she could work full time.

15

16 (Id.)

17

18          **D.   Vocational Expert's Testimony**

19      The VE categorized Stelzl's past work as kitchen helper, which

20 is an unskilled job, medium exertional level, with an SVP of 2[13];

21

22  _____

23      [13]Jobs are classified with an "SVP," indicating the level of
   "specific vocational preparation" required to perform the job,
   according to the *Dictionary of Occupational Titles*.  The SVP "is
24 defined as the amount of lapsed time required by a typical worker
   to learn the techniques, acquire the information, and develop the
25 facility needed for average performance in a specific job-worker
   situation." *Davis v. Astrue*, slip op., 2011 WL 6152870, at *9 n.7
26 (D. Or. Dec. 7, 2011) (Simon, J.) (citation omitted).  "The DOT
   identifies jobs with an SVP level of 1 or 2 as unskilled, jobs with
27 an SVP of 3 or 4 as semi-skilled, and jobs with an SVP of 5 or
   higher as skilled." *Whitney v. Astrue*, slip op., 2012 WL 712985, at
28 3 (D. Or Mar. 1, 2012) (Brown, J.) (citing SSR 00-4p).

1  and file clerk, a light, semi-skilled job with an SVP of 3.  The VE

2  noted Stelzl was not performing the full range of file clerk duties,

3  "so it could be at the unskilled SVP 2 level."  (A.R. 69)  In

4  addition, he noted the contribution to Stelzl's wages by her father

5  was "an accommodation."  (*Id.*)

6      The ALJ asked the VE to consider an individual of Stelzl's age,

7  with a community college education, who is capable of performing

8  light work "limited to . . . tasks no more complex than one to three

9  steps or the equivalent of SVP2, entry level work. . . .  The

10  individual due to episodes of hypoglycemia should never be exposed

11  to hazards and should never climb ladders, ropes or scaffolds.  The

12  individual . . . should have no public contact but can handle brief

13  superficial coworker contact."  (A.R. 70)  The VE indicated the

14  hypothetical individual would be unable to return to Stelzl's past

15  work as a kitchen helper.[14]  However, the VE opined the individual

16  would be able to do a job as a document preparer[,] . . . an

17  unskilled, sedentary job," with an SVP of 2.  (A.R. 70-71)  In

18  addition, the individual could work as an eyeglass assembler, "an

19  unskilled sedentary job."  (A.R. 71)  The VE further stated it

20

---

21      [14]The VE's testimony is unclear as to whether someone limited

22  to one- to three-step tasks could perform the file clerk job.  The
   VE indicated the file clerk job ordinarily is "a light job, semi-

23  skilled, SVP3"; however, as Stelzl was performing the job, it "may
   be a little less multitasking and involved than the full range of

24  file clerk duties, so it could be at the unskilled SVP 2 level."
   (A.R. 69)  The VE testified the individual in the ALJ's hypotheti-

25  cal question "couldn't be kitchen helper as it's a medium exer-
   tional level."  (A.R. 70)  The VE then stated, "Well – and if we

26  accept my – where I'm stating she's working outside of the normal
   designation for file clerk --," and the ALJ responded, "I'll accept

27  that."  (*Id.*)  It is not clear whether the VE was indicating the
   hypothetical individual could, or could not, perform the file clerk

28  job as Stelzl was performing it.

54 - FINDINGS & RECOMMENDATION

1 "sounds as if [Stelzl] may have some hand skills," so she also could

2 work as a small product assembler, an unskilled, light job. (*Id.*)

3     If the hypothetical individual "had no limits on standing but

4 could only tolerate sitting for about a half an hour at a time," she

5 would be unable to perform the eyeglass assembler job, but could

6 perform the document preparer job, which would allow for a short

7 break every half hour. (*Id.*)  In addition, the individual could

8 work as a garment bagger, a light job. (A.R. 72)  If the individual

9 would miss half a day of work per month for medical appointments,

10 she still would be able to perform these jobs.  The VE indicated

11 that at the unskilled level, most employers would tolerate "no more

12 than a range between two and three" days off work per month. (*Id.*)

13     Returning to the ALJ's first hypothetical question, if the

14 individual were limited to lifting no more than ten pounds, she

15 still could work as a document preparer, eyeglass assembler, and

16 small product assembler. (*Id.*)

17     In colloquy with Stelzl's attorney, the ALJ took administrative

18 notice that if Stelzl's mental limitations were as found by

19 counselor Lester (*see* A.R. 491-95), then Stelzl would be precluded

20 from all work. (A.R. 73)

21

22 **III.  DISABILITY DETERMINATION AND THE BURDEN OF PROOF**

23               **A.  Legal Standards**

24     A claimant is disabled if he or she is unable to "engage in any

25 substantial gainful activity by reason of any medically determinable

26 physical or mental impairment which . . . has lasted or can be

27 expected to last for a continuous period of not less than 12

28 months[.]"  42 U.S.C. § 423(d)(1)(A).

55 - FINDINGS & RECOMMENDATION

1    "Social Security Regulations set out a five-step sequential

2 process for determining whether an applicant is disabled within the

3 meaning of the Social Security Act." *Keyser v. Commissioner*, 648

4 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The

5 Keyser court described the five steps in the process as follows:

6              (1) Is the claimant presently working in a
                substantially gainful activity?  (2) Is the
7              claimant's impairment severe?  (3) Does the
                impairment meet or equal one of a list of
8              specific impairments described in the regula-
                tions? (4) Is the claimant able to perform any
9              work that he or she has done in the past? and
                (5) Are there significant numbers of jobs in
10             the national economy that the claimant can
                perform?

11

12 *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,

13 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d 949,

14 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and

15 416.920 (b)-(f)).  The claimant bears the burden of proof for the

16 first four steps in the process.  If the claimant fails to meet the

17 burden at any of those four steps, then the claimant is not

18 disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*, 482

19 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987);

20 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth general

21 standards for evaluating disability), 404.1566 and 416.966

22 (describing "work which exists in the national economy"), and

23 416.960(c) (discussing how a claimant's vocational background

24 figures into the disability determination).

25    The Commissioner bears the burden of proof at step five of the

26 process, where the Commissioner must show the claimant can perform

27 other work that exists in significant numbers in the national

28 economy, "taking into consideration the claimant's residual

56 - FINDINGS & RECOMMENDATION

1  functional capacity, age, education, and work experience." *Tackett*

2  *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner

3  fails meet this burden, then the claimant is disabled, but if the

4  Commissioner proves the claimant is able to perform other work which

5  exists in the national economy, then the claimant is not disabled.

6  *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f),

7  416.920(f); *Tackett*, 180 F.3d at 1098-99).

8       The ALJ also determines the credibility of the claimant's

9  testimony regarding his or her symptoms:

10          In deciding whether to admit a claimant's
            subjective symptom testimony, the ALJ must
11          engage in a two-step analysis. *Smolen v.*
            *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
12          Under the first step prescribed by *Smolen*,
            . . . the claimant must produce objective
13          medical evidence of underlying "impairment,"
            and must show that the impairment, or a combi-
14          nation of impairments, "could reasonably be
            expected to produce pain or other symptoms."
15          *Id.* at 1281-82.  If this . . . test is satis-
            fied, and if the ALJ's credibility analysis of
16          the claimant's testimony shows no malingering,
            then the ALJ may reject the claimant's testi-
17          mony about severity of symptoms [only] with
            "specific findings stating clear and convincing
18          reasons for doing so."  *Id.* at 1284.

19  *Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2004).

20

21                    **B.   The ALJ's Decision**

22       The ALJ found Stelzl has not engaged in substantial gainful

23  activity since her alleged disability onset date of January 19,

24  1971. (A.R. 14)  She found Stelzl has severe impairments consisting

25  of "insulin dependent type 1 diabetes mellitus and pervasive devel-

26  opmental disorder, not otherwise specified." (*Id.*)  The ALJ noted

27  that although Stelzl's diagnosis "does not satisfy all the criteria,

28  it is most consistent with Asperger's syndrome, as it is primarily

characterized by difficulties with social interactions." (A.R. 15)
The ALJ found Stelzl's other mental and physical complaints,
including "history of mood disorder, sleep apnea, back pain, severe
learning disability and borderline intellectual functioning," are
no more than transient, and the evidence does not establish that any
of those impairments causes Stelzl any significant vocational limi-
tations. The ALJ therefore found those other impairments to be non-
severe. (*Id.*)

The ALJ further found that none of Stelzl's impairments, singly
or in combination, meets or medically equals a listed impairment,
particularly considering listing 12.10 (Autism and Other Pervasive
Development Disorders). The ALJ found Stelzl has mild restriction
of the activities of daily living, moderate limitations in social
functioning, and moderate limitations with regard to concentration,
persistence, or pace. She found Stelzl has had no extended episodes
of decompensation. (A.R. 16-17)

The ALJ found Stelzl has the RFC to lift/carry up to 20 pounds
occasionally and 10 pounds frequently; stand/walk up to six hours
in an eight-hour work day; and sit for up to six hours in an eight-
hour work day. She would be "limited to tasks no more complex than
one to three steps, equivalent to entry level work in the Dictionary
of Occupational Titles," with no work around hazards due her
hypoglycemic episodes, and she should have "no contact with the
general public, though brief, superficial contact with co-workers
is permissible." (A.R. 17)

The ALJ found Stelzl's "statements concerning the intensity,
persistence and limiting effects of [her] symptoms are not credible
to the extent they are inconsistent with the above residual func-

58 - FINDINGS & RECOMMENDATION

1  tional capacity assessment." (A.R. 18)  She found Stelzl's reported
2  daily activities and overall level of functioning to be inconsistent
3  with her allegations of disability.  The ALJ noted that despite
4  being given the opportunity to do so, Stelzl failed to provide
5  records that she received accommodations in connection with her
6  schooling, only providing a "transcript showing that her grades were
7  average." (*Id.*)  In addition, she found the record evidence fails
8  to show Stelzl would be unable to perform in a full-time job. The
9  ALJ also noted that a person's inability to manage credit card debt
10  is not necessarily indicative of disability." (A.R. 19)

11      The ALJ further noted Stelzl had traveled to Costa Rica for
12  eight days in August 2004.  She observed such a trip would have
13  required airport check-ins with luggage, and standing in security
14  lines and customs and immigration lines, and dealing with fellow
15  passengers, as well as airline and customers ands immigration
16  personnel." (A.R. 18)  The ALJ observed that "[a]lthough travel and
17  disability are not necessarily mutually exclusive, [Stelzl's]
18  decision to travel abroad tends to suggest that the alleged symptoms
19  and limitations may have been overstated and erodes the credibility
20  of her allegations.  The capacity to travel may also be viewed as
21  inconsistent with allegations of disabling pain and social
22  limitations." (*Id.*)

23      The ALJ gave only "limited weight" to the opinions of
24  Dr. Gordon, and counselors Lester and Broomberg, that Stelzl is
25  unable to work full time.  The ALJ found Dr. Gordon's opinion that
26  Stelzl would be unable to work is inconsistent with Dr. Gordon's
27  treatment notes.  The ALJ noted counselors Lester and Broomberg are
28  not "acceptable treating sources," and further, "Ms. Lester did not

59 - FINDINGS & RECOMMENDATION

1  even provide session notes."  She gave "no weight" to Lester's
2  opinion regarding Stelzl's mental RFC.  (*Id.*)

3      The ALJ gave "substantial weight" to Dr. McConochie's evalua-
4  tion and opinion regarding Stelzl's mental RFC.  The ALJ noted
5  Dr. McConochie had "opined that [Stelzl] could handle routine acti-
6  vities of daily living, and she demonstrated no significant
7  impairment understanding and remembering instructions or sustaining
8  concentration, persistence, and pace."  (*Id.*)  Although the ALJ
9  acknowledged Dr. McConochie's report contains some errors, as noted
10 by Leslie Stelzl in her testimony, the ALJ found that "nothing in
11 the discrepancies [Leslie] reported affects [the doctor's] conclu-
12 sions or changes the weight given to . . . those conclusions."
13 (A.R. 20)  The ALJ found Leslie's testimony was "based largely on
14 the self-report of [Stelzl] to her mother," and was inconsistent
15 with the medical evidence of record.  (*Id.*)  Therefore, although the
16 ALJ considered Leslie's testimony, she found it had "little
17 probative value."  (*Id.*)

18     The ALJ found Stelzl has no past relevant work as defined in
19 the regulations.  She found, "Considering [Stelzl's] age, education,
20 and work experience, and residual functional capacity, there are
21 jobs that exist in significant numbers in the national economy that
22 [she] can perform."  (*Id.*)  She found Stelzl can perform less than
23 the full range of light work.  Based on the VE's testimony, the ALJ
24 concluded Stelzl would be able to work as a file clerk,[15] eyeglass

25

26

---

27     [15]The ALJ found Stelzl could work as a file clerk, despite the
28 lack of clear testimony by the VE regarding her ability to perform
   that job.  *See* note 14, *supra*.

60 - FINDINGS & RECOMMENDATION

1 assembler, small products assembler, and garment bagger.  She

2 therefore concluded Stelzl is not disabled.  (A.R. 20-21)

3

4                    *IV.   STANDARD OF REVIEW*

5       The court may set aside a denial of benefits only if the

6 Commissioner's findings are "'not supported by substantial evidence

7 or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*

8 *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc.*

9 *Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black V.*

10 *Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1 (9th

11 Cir. May 20, 2011).  Substantial evidence is '"more than a mere

12 scintilla but less than a preponderance; it is such relevant

13 evidence as a reasonable mind might accept as adequate to support

14 a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039

15 (9th Cir. 1995)).

16       The court "cannot affirm the Commissioner's decision 'simply

17 by isolating a specific quantum of supporting evidence.'"  *Holohan*

18 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*

19 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court

20 must consider the entire record, weighing both the evidence that

21 supports the Commissioner's conclusions, and the evidence that

22 detracts from those conclusions.  *Id.*  However, if the evidence as

23 a whole can support more than one rational interpretation, the ALJ's

24 decision must be upheld; the court may not substitute its judgment

25 for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*,

26 486 F.3d 1149, 1152 (9th Cir. 2007)).

27 / / /

28 / / /

1           *V.  DISCUSSION*

2        Stelzl argues the ALJ erred in several respects in rendering
3   her decision in this case.  Each of her arguments is discussed
4   below.

5

6            *A.  Credibility Analysis*

7        Stelzl argues the ALJ failed to give clear and convincing
8   reasons for rejecting her testimony.  *See Batson*, 359 F.3d at 1196.
9   The ALJ listed five reasons for finding Stelzl's testimony less than
10  fully credible.  Stelzl asserts each of those reasons is rebutted
11  by the evidence.

12

13  *1.  Activities of daily living*

14       The ALJ found Stelzl's activities of daily living are incon-
15  sistent with her allegations of disability.  The ALJ stated, "For
16  example, [Stelzl] reported during a consultative examination with
17  William A. McConchie, Ph.D., that she could be on her feet and busy
18  for a couple of hours before she has to rest."  (A.R. 18)  The ALJ
19  noted that although Stelzl's mental disorder "is primarily charac-
20  terized by difficulties with social interactions," Stelzl never-
21  theless has been "active in a bowling league and has friends with
22  whom she regularly socializes."  (*Id.*)  The ALJ found these acti-
23  vities contradicted Stelzl's hearing testimony that she has "signi-
24  ficant difficulties engaging in social activities with others."
25  (*Id.*)  Stelzl argues her mother clarified that the bowling league
26  was for disabled individuals, and Stelzl did scrapbooking with one
27  autistic friend.  Stelzl argues her social deficits "would be less
28  of a problem" in those types of situations.  Dkt. #14, p. 12.

62 - FINDINGS & RECOMMENDATION

The Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *accord Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (citing *Vertigan*). The Ninth Circuit recognizes two grounds for using daily activities to form the basis of an adverse credibility determination. The first is when a claimant's daily activities contradict the claimant's other testimony. The second is when the "'claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); citing *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

In the present case, the Commissioner relies on the first of these two grounds, finding Stelzl's self-reports about her functional abilities are inconsistent with her allegations of disability. The ALJ found the evidence shows Stelzl "lives independently and is capable of handling routine activities of daily living, though she depends on family for shelter. . . . She is able to dress and bathe herself, tie her shoes and make telephone calls. She is also able to drive, complete routine household chores, grocery shop, and cook meals for herself." (A.R. 16; exhibit citation omitted)  The ALJ further noted that Stelzl told Dr. McConochie "she has three friends whom she sees occasionally and with whom she makes dinner, goes to the movies and does hand crafts." (*Id.*, citing A.R. 504)  The Commissioner argues that even if the evidence would support a different interpretation, an ALJ may discount a claimant's equivocal

1  testimony as long as the ALJ's interpretation of the evidence is
2  reasonable, and supported by substantial evidence. Dkt. #15, p. 8
3  (quoting *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989)).

4      "If substantial evidence supports the administrative findings,
5  or if there is conflicting evidence supporting a finding of either
6  disability or nondisability, the ALJ's decision is conclusive, . . .
7  and may be set aside only if an improper legal standard was applied
8  in weighing the evidence." *Karout v. Astrue*, slip op., 2013 WL
9  1946222, at *3 (D. Or. May 6, 2013) (Aiken, CJ) (citations omitted).
10 As related to Stelzl's *physical* abilities, the court agrees with the
11 ALJ that Stelzl's self-reported daily activities are inconsistent
12 with her allegations of disability.  The same cannot be said with
13 regard to Stelzl's mental abilities.  The problem with relying on
14 Stelzl's own testimony is her apparent inability to recognize her
15 own limitations.  The evidence indicates Stelzl consistently sees
16 herself as more capable and independent than is shown by others'
17 observations of her.  Despite her expressed desire to live
18 independently, the weight of the evidence indicates she is not
19 capable of doing so.  Her income is subsidized by her father; her
20 parents assist her with shelter and money management; and although
21 Stelzl engages in some social activities, they are in sheltered or
22 supervised settings.  The court finds the ALJ erred in relying on
23 Stelzl's daily activities in discounting her credibility.

24

25 **2.   *Educational pursuits***

26      The ALJ cited Stelzl's ability to attend community college from
27 1989 to 1995, and her cumulative grade point average of 2.213, as
28 evidence detracting from Stelzl's claim that she is disabled. (A.R.

8) Stelzl notes it took her from fall 1990, to July 1995, to obtain an Associate's degree, and her mother testified Stelzl "was given extra time for testing." Dkt. #14, p. 12. Thus, she argues it was error for the ALJ to weigh Stelzl's educational pursuits against her credibility.

Neither Stelzl nor the Commissioner cites persuasive authority to support their respective positions. *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005), cited by the Commissioner, is distinguishable on its facts. The claimant in that case "was able to complete high school, college, and a Certified Nurses' Aide training program, in addition to participating in military training." Dkt. #15, p. 8, citing *Bayliss*, 427 F.3d at 1216. Bayliss's educational activities were far more extensive than Stelzl's. Nevertheless, the court agrees with the Commissioner that Stelzl's educational pursuits weigh against her disability claim. Even though it took her several years to complete her degree (roughly three times as long as normal), Stelzl took courses throughout that time period, and maintained a 2.213 grade average. Although she may have been given extra time to take tests, her ability to complete the work required for her courses, and to attend classes regularly, is evidence that she can maintain attention and concentration. The ALJ found Stelzl has moderate limitations in the area of concentration, persistence, or pace, but Stelzl "demonstrated good attention and concentration for the lengthy interview and testing process" during her evaluation by Dr. McConochie. (A.R. 16) In addition, Stelzl's regular attendance at her college courses contradicts her testimony that she is unable to be around people. The court finds the ALJ did not err in weighing Stelzl's educational pursuits against her credibility.

65 - FINDINGS & RECOMMENDATION

### 3.    *Ability to Travel*

The ALJ noted Stelzl "traveled to Costa Rica for eight days" in August 2004.  She noted such a trip would have "required airport check-ins with luggage, and standing in security lines and customs and immigration lines, and dealing with fellow passengers, as well as airline and customs and immigration personnel." (A.R. 18)  The ALJ acknowledged that "[a]lthough travel and disability are not necessarily mutually exclusive, [Stelzl's] decision to travel abroad tends to suggest that the alleged symptoms and limitations may have been overstated and erodes the credibility of her allegations.  The capacity to travel may also be viewed as inconsistent with allega-tions of disabling pain and social limitations."  (*Id.*)

Stelzl notes the evidence indicates she was taking the trip to Costa Rica with her father, and she argues "it can be expected that he maneuvered their way th[r]ough security and customs and that [Stelzl] was not required to operate independently."  Dkt. #14, p. 13 (citing A.R. 235).  Standing alone, the single notation that Stelzl was planning a trip to Costa Rica with her father would not detract from Stelzl's credibility.  However, taken together with the evidence as a whole, Stelzl's ability to travel at least calls into question her claim that she has problems "interacting socially with customers, clients, co-workers and supervisers [sic]." (A.R. 158)  The ALJ noted the types of superficial interactions one can expect to have while traveling, such as standing in lines, and "dealing with fellow passengers, as well as airline and customs and immigra-tion personnel" (A.R. 18), *suggests* Stelzl may have overstated her limitations in this regard.  The court finds the ALJ did not err in

1   weighing this factor against Stelzl's credibility, considering the

2   totality of the evidence.

3

4   **4.   *Stelzl's work history***

5        The ALJ found that although none of Stelzl's work has been at

6   the substantial gainful activity level, the fact that she has been

7   able to continue working part time for a sustained period of time

8   indicates Stelzl's "activities, at least at times, have been some-

9   what greater than [she] has generally reported." (*Id.*)   Stelzl

10  notes her supervisor indicated the real estate office would not hire

11  Stelzl full time even if there was a full-time position available,

12  and Stelzl's tasks are very limited.   The supervisor opined that

13  Stelzl "is working to her full capacity at 12 hours per week," and

14  likely could not sustain full-time work. (A.R. 230) Stelzl argues,

15  "This statement from the employer is compelling evidence that

16  [Stelzl] cannot sustain full time, competitive work." Dkt. #14,

17  p. 13.  Stelzl cites SSR 85-16 in support of this argument. SSR 85-

18  16 advises that "relevant, reliable information, obtained from third

19  party sources such as . . . employers, may be valuable in assessing

20  an individual's level of activities of daily living." SSR 85-16,

21  available at 1985 WL 56855.  However, the Ruling goes on to state,

22  "Information concerning an individual's performance in any work

23  setting (including sheltered work and volunteer or competitive work)

24  . . . may be pertinent in assessing the individual's ability to

25  function in a competitive work environment." *Id.*

26       The ALJ considered the supervisor's statement that Stelzl

27  performs well, within the limited scope of her duties. The ALJ did

28  not rely on the supervisor's opinion regarding Stelzl's ability to

67 - FINDINGS & RECOMMENDATION

work full time - and rightly so. "Determinations regarding a clai-
mant's ability to work are reserved for the Commissioner[,]" *Ranier
v. Colvin*, slip op., 2013 WL 1809745, at 8 & n.1 (D. Or. Apr. 29,
2013) (Simon, *J.*); and even a medical source's opinion that a clai-
mant is disabled is not controlling. *See* 20 C.F.R. §§ 404.1527(d)
& (e), 416.927(d) & (e); SSR 96-5p, available at 1996 WL 374183.

The evidence indicates Stelzl has worked in a nursing home, has
done some in-home elder care, and has worked part-time at the real
estate office since 2003. The ALJ found Stelzl's "willingness and
demonstrated ability to engage in some work activity further erodes
the credibility of her allegations of disability." (A.R. 18) The
problem with this finding is that, as the ALJ also found, Stelzl has
*never* engaged in work at the substantial gainful activity level.
Her work has been part-time, and her long-term, subsidized job has
been tantamount to a sheltered work situation, where Stelzl has been
given extremely limited duties, specifically chosen to fit within
her limited abilities. The court finds the ALJ erred in concluding
this type of work activity detracts from Stelzl's credibility.

## 5.  *Money management*

The ALJ noted Stelzl testified "she manages her money inde-
pendently," but Stelzl's mother testified she has to "bail" Stelzl
out when Stelzl "mis-uses her credit cards. (A.R. 19) The ALJ con-
cluded that while "[i]t may not be a good idea for [Stelzl] to have
credit cards, . . . difficulty managing that kind of debt is not
necessarily indicative of disability." (*Id.*) Stelzl's mother indi-
cated Stelzl has problems balancing her checkbook, so Stelzl often
pays her bills with money orders or cash. (A.R. 186) Stelzl,

1  herself, indicated she pays her own bills.  (A.R. 178)  This

2  evidence indicates that although Stelzl may have difficulty handling

3  credit, and even difficulty balancing a checkbook, she nevertheless

4  is able to purchase money orders and pay her bills.  The court finds

5  ALJ did not err in finding this evidence undermines the credibility

6  of Stelzl's claim that she is disabled.

7

8  *5.  Conclusion*

9      The court finds substantial evidence does not support the ALJ's

10 conclusion that Stelzl's allegations regarding her mental functional

11 abilities are less than fully credible.  The ALJ's error was in

12 relying on discrete pieces of evidence out of the context of the

13 evidence as a whole.  The undersigned recommends the case be

14 remanded with instructions to the ALJ to revisit the credibility

15 determination in the context of the evidence as a whole.

16

17          *B.  Weight Given to Dr. Gordon's Opinion*

18     Stelzl argues the ALJ failed to give proper weight to the

19 opinion of Dr. Gordon, Stelzl's treating psychiatrist, that Stelzl

20 "is not able to obtain further employment or pursue vocational

21 training at this time in part due to the . . . diagnostic problem

22 she struggles with." (A.R. 483)  The ALJ found this statement to

23 be inconsistent with Dr. Gordon's own treatment notes.  (A.R. 19)

24     The ALJ determines the credibility of the medical testimony and

25 also resolves any conflicts in the evidence.  *Batson v. Comm'r of*

26 *Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney*

27 *v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).  Ordinarily, the

28 ALJ must give greater weight to the opinions of treating physicians,

1  but the ALJ may disregard treating physicians' opinions where they

2  are "conclusory, brief, and unsupported by the record as a whole,

3  . . . or by objective medical findings." *Id.* (citing *Matney, supra*;

4  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)).  If the

5  ALJ disregards a treating physician's opinions, "'the ALJ must give

6  specific, legitimate reasons'" for doing so.  *Id.* (quoting *Matney*).

7         The law regarding the weight to be given to the opinions of

8  treating physicians is well established.  Generally, "[t]he opinions

9  of treating physicians are given greater weight than those of

10  examining but non-treating physicians or physicians who only review

11  the record." *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1036

12  (9th Cir. 2003).  The *Benton* court quoted with approval from *Lester*

13  *v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), where the court held

14  as follows:

15              As a general rule, more weight should be given
               to the opinion of a treating source than to the
16              opinion of doctors who do not treat the clai-
               mant.  At least where the treating doctor's
17              opinion is not contradicted by another doctor,
               it may be rejected only for "clear and convin-
18              cing" reasons.  We have also held that "clear
               and convincing" reasons are required to reject
19              the treating doctor's ultimate conclusions.
               Even if the treating doctor's opinion is con-
20              tradicted by another doctor, the Commissioner
               may not reject this opinion without providing
21              "specific and legitimate reasons" supported by
               substantial evidence in the record for so
22              doing.

23  *Id.* (quoting *Lester, supra*).

24         Here, the ALJ made a one-sentence finding regarding

25  Dr. Gordon's opinion: "The observations in Dr. Gordon's treatment

26  notes are not consistent with the restricted opinion she provides."

27  (A.R. 19)  The ALJ did not discuss what evidence in Dr. Gordon's

28  treatment notes was inconsistent with the doctor's opinion. An ALJ

70 - FINDINGS & RECOMMENDATION

1  may not reject a treating doctor's opinion without providing "speci-
2  fic and legitimate reasons' supported by substantial evidence in the
3  record. . . .   This can be done by setting out a detailed and
4  thorough summary of the facts and conflicting clinical evidence,
5  stating [the ALJ's] interpretation thereof, and making findings."
6  *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (citations
7  omitted).   The *Orn* court further held, "The ALJ must do more than
8  offer [her] conclusions. [She] must set forth [her] own interpreta-
9  tions and explain why they, rather than the doctors', are correct."
10  *Id.* (citation omitted).

11      The ALJ in the present case failed to do any more than state
12  her conclusion that Dr. Gordon's treatment notes were inconsistent
13  with her opinion regarding Stelzl's functional capacity.   The ALJ's
14  failure to discuss the evidence underlying this conclusion was
15  error.  *See id.*  On remand, the ALJ should be required to set forth
16  Dr. Gordon's specific treatment notes that contradict the doctor's
17  opinion regarding Stelzl's functional capacity.[16]

18

19              *C.  Weight Given to Counselors' Opinions*

20      Stelzl argues the ALJ erred in rejecting the opinions of Nan
21  Lester and Lola Broomberg.  The ALJ gave Lester's and Broomberg's
22  opinions "limited weight." (A.R. 19)  The ALJ noted Lester and
23  Broomberg do not qualify as "acceptable medical sources" under the

24  ───────────────

25      [16]If this were the ALJ's only error in this case, the court
    likely would find the error to be harmless, as Dr. Gordon's
26  treatment notes do contain entries that are inconsistent with her
    conclusion. However, because the undersigned recommends remand for
27  other reasons, the ALJ also should be required to correct this
    error, setting forth her reasons for rejecting Dr. Gordon's
28  opinion.

1   regulations.  (*Id.*)   The ALJ found the opinions of Lester and
2   Broomberg were inconsistent with "the results of formal testing and
3   Dr. Gordon's treatment notes." (*Id.*)  The ALJ further noted Lester
4   had not provided any session notes, and although the mental RFC
5   provided by Lester "is inconsistent with employment[,] . . . as it
6   is unsupported by clinical notes, it is given no weight."  (*Id.*)

7      Stelzl  acknowledges  that  Lester  and  Broomberg  are  not
8   "acceptable medical source[s]" under the regulations, but she argues
9   the Social Security Administration has recognized that such a source
10  may be entitled to more weight than an acceptable source, "'if he
11  or she has seen the individual more often . . . and has provided
12  better supporting evidence and a better explanation for his or her
13  opinions.'" Dkt. #14, pp. 16-17 (quoting SSR 06-3p, available at
14  2006 WL 2329939).  Stelzl further argues her counselors' opinions
15  are consistent with the results of Stelzl's extensive evaluation at
16  CDRC, and with many of Dr. Gordon's observations throughout their
17  treatment relationship.  Stelzl notes that over a six-year period,
18  Dr. Gordon noted occasions when Stelzl had "a constricted, blunted
19  or  flat  effect,  little  facial  expression,  and  being  'somewhat
20  disconnected emotionally.'" Dkt. #14, p. 17 (citing A.R. 291, 295,
21  311, 484).  Dr. Gordon also noted times when Stelzl was "'slow-
22  moving,' showing some perseveration, and tangentiality," as well as
23  occasions when Stelzl reported suicidal ideation. *Id.* (citing A.R.
24  291, 295, 309, 485, 488).

25     Although the counselors' opinions differ from Dr. McConochie's
26  conclusions, Stelzl argues that doctor's opinion "is, to a large
27  extent, an aberration in the record." *Id.*  She notes Dr. McConochie
28  did  not  diagnose  her  with  any  mental  condition  at  all,  which

72 - FINDINGS & RECOMMENDATION

1    contrasts with the ALJ's own finding that Stelzl suffers from "a
2    pervasive developmental disorder, most consistent with Asperger's
3    syndrome." *Id.*   The doctor's opinion that Stelzl "has only mild
4    impairment in social functioning and has no impairment in concentra-
5    tion" also differs from the ALJ's finding that Stelzl has moderate
6    limitations in these areas. *Id.* (citing A.R. 16, 499). Stelzl also
7    points to internal inconsistencies in Dr. McConochie's report,
8    noting that despite finding she has no limitation in concentration,
9    the doctor also found Stelzl's processing speed is "in the border-
10   line range and 'could be expected to limit her ability in jobs such
11   as she has held as a file clerk and doing odd jobs in a nursing
12   home.'" *Id.*, p. 18 (citing A.R. 506).

13       The Commissioner argues Stelzl's claim that the evidence
14   supports the counselors' opinions is Stelzl's "own subjective view
15   of the record that does not undermine the ALJ's holding." Dkt. #15,
16   p. 14.   The Commissioner notes the ALJ gave germane reasons for
17   discounting each counselor's opinions; i.e., that their opinions
18   "contradicted the formal tests and insignificant [sic] findings in
19   Dr. Gordon's treatment notes." *Id.* (citing A.R. 19).  The Commis-
20   sioner further argues that even assuming a different conclusion
21   could be drawn from the evidence, "'[w]here evidence is susceptible
22   to more than one rational interpretation, it is the [Commissioner's]
23   conclusion that must be upheld.'" *Id.* (quoting *Burch v. Barnhart*,
24   400 F.3d 676, 679 (9th Cir. 2005) (citations omitted).  Further,
25   with regard to Lester, the Commissioner argues "one of the key
26   factors in weighing a medical opinion is its supportability," and,
27   as the ALJ noted, Lester's opinion was wholly unsupported by any
28   treatment notes.  *Id.*, p. 15.

73 - FINDINGS & RECOMMENDATION

1    An ALJ may discount testimony from "other sources," such as

2 Stelzl's counselors, "if the ALJ gives reasons germane to each

3 witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th

4 Cir. 2012) (internal quotation marks, citation omitted); *accord*

5 *Blodgett v. Comm'r*, ___ Fed. Appx. ___, 2013 WL 3804070 (9th Cir.

6 July 23, 2013).  The ALJ met this standard, giving reasons germane

7 to Lester and Broomberg for rejecting their testimony.  Although the

8 court has serious concerns about relying on Dr. McConochie's report

9 due to the large number of errors it contains, the ALJ gave other

10 reasons for discounting the counselors' opinions.

11    Further, the court rejects Stelzl's argument that her

12 counselors' opinions were consistent with her evaluation at CDRC.

13 That evaluation occurred in May 2003, nearly six years before Stelzl

14 first saw Broomberg. Again, with no treatment notes from Lester, her

15 opinion is wholly unsupported.  The court finds the ALJ did not err

16 in the weight he gave to the counselors' opinions.

17

18    ### D.  *Weight Given to Lay Witness Testimony*

19    Stelzl argues the ALJ erred in rejecting Leslie Stelzl's

20 testimony, which Stelzl argues was "highly consistent" with the

21 opinions of Broomberg, Dr. Gordon, and the 2003 evaluation by

22 Dr. Eisert. Dkt. #14, pp. 16-18.  The ALJ found Leslie's "testimony

23 was based largely on the self-report of the claimant to her mother,"

24 and was inconsistent with the medical evidence of record. (A.R. 20)

25    The court disagrees that Leslie's opinions regarding Stelzl's

26 functioning were simply based on Stelzl's self-reports; rather, they

27 were based on the mother's ongoing, regular observation of her

28 daughter, and the assistance she provides Stelzl in managing her

74 - FINDINGS & RECOMMENDATION

1   finances, among other things.  Leslie Stelzl's testimony was con-

2   sistent with the opinions of Stelzl's treating physician, her

3   counselors, her supervisor at work - indeed, with nearly everyone

4   who has encountered this claimant.  The court finds the ALJ erred

5   in rejecting Leslie Stelzl's testimony.

6

7               **E.   Reliance on VE's Testimony**

8        Stelzl argues the hypothetical question the ALJ posed to the

9   VE "did not include the ALJ's own findings that [Stelzl] has

10  moderate limitations in social functioning and in concentration,

11  persistent [sic] or pace."  Dkt. #14, p. 20 (citing A.R. 14-15).

12  She notes the hypothetical question "included a limitation to entry

13  level unskilled work[;] however, this has been found . . . not to

14  incorporate limitations in concentration, persistence and pace."

15  *Id.* (citing *Winschel v. Comm'r*, 631 F.3d 1176, 1179 (11th Cir.

16  2011); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004);

17  *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (*per

18  curiam*)).  Stelzl also argues the ALJ's hypothetical question failed

19  to "address Dr. McConochie's test results showing that [Stelzl's]

20  processing speed was in the borderline range and could be expected

21  to limit her ability and [sic] jobs such as she has held as a file

22  clerk and doing odd jobs in a nursing home."  *Id.* (citing A.R. 505-

23  06).  She therefore argues the VE's testimony, based on an improper

24  hypothetical question, cannot meet the Commissioner's burden to

25  prove she is capable of full-time work within her RFC.  I*d.*, pp. 19-

26  20.

27       The Commissioner argues the ALJ's hypothetical question did not

28  need to include her finding that Stelzl has moderate limitations in

1 social functioning, and in concentration, persistence, and pace.
2 The Commissioner asserts those findings "pertained to step three [of
3 the sequential evaluation process], where an ALJ must make general-
4 ized findings for purposes of determining whether [a claimant]
5 medically met or equaled a recognized, listed impairment that shows
6 presumptive disability." Dkt. #15, pp. 17-18 (citing 20 C.F.R.
7 §§ 404.1520a(c)(3), 416.920a(c)(3); *Keyser V. Comm'r*, 648 F.3d 721,
8 725 (9th Cir. 2011)). The Commissioner argues those limitations
9 found at step three are not the same as a claimant's RFC, or work-
10 related abilities. *Id.* (citing SSR 96-8p, available at 1996 WL
11 374184, at *4; 20 C.F.R. 404.1520a(d)(3), 416.920a(d)(3) ("If we
12 find that you have a severe mental impairment(s) that neither meets
13 nor is equivalent in severity to any listing, we will then assess
14 your residual functional capacity.")). The Commission notes the ALJ
15 "specifically reiterated this distinction in her decision." *Id.*
16 (citing A.R. 17).

17    Stelzl's argument and the Commissioner's response highlight an
18 ongoing issue among the courts regarding the relationship between
19 an ALJ's findings at steps two and three, where the ALJ determines
20 whether the claimant has a severe impairment that meets or equals
21 a listed impairment; the RFC, which the ALJ determines at step four;
22 and whether the hypothetical question posed to a VE must account for
23 limitations identified in the step two/three inquiry. The court in
24 *Winschel v. Commissioner of Social Security*, 631 F.3d 1176 (11th
25 Cir. 2011), cited by Stelzl, noted that the Third, Seventh, and
26 Eighth Circuits have rejected the Commissioner's position "that to
27 include such limitations in a hypothetical question would inappro-
28 priately conflate [the] independent inquiries [at steps two/three

76 - FINDINGS & RECOMMENDATION

1  and step four][.]"  *Id.*, 631 F.3d at 1180 (citing cases).  The

2  *Winschel* court also rejected the argument, finding that although the

3  two inquiries are "undeniably distinct," nothing in the regulations

4  precludes the ALJ from considering the results of the step two/three

5  inquiry in his determination of the claimant's RFC.  *Id.*

6       Specifically regarding what a proper hypothetical question must

7  include, the *Winschel* court held as follows:

> Other circuits have also rejected the
> argument that an ALJ generally accounts for a
> claimant's limitations in concentration, per-
> sistence, and pace by restricting the hypo-
> thetical question to simple, routine tasks or
> unskilled work.  *See Stewart v. Astrue*, 561
> F.3d 679, 685-85 (7th Cir. 2009) (*per curiam*);
> *Ramirez [v. Barnhart]*, 372 F.3d [546,] 554 [(3d
> Cir. 2004)]; *Newton [v. Chater]*, 92 F.3d [688,]
> 695 [(8th Cir. 1996)].  But when medical evi-
> dence demonstrates that a claimant can engage
> in simple, routine tasks or unskilled work
> despite limitations in concentration, per-
> sistence, and pace, courts have concluded that
> limiting the hypothetical to include only
> unskilled work sufficiently accounts for such
> limitations.  *See Simila v. Astrue*, 573 F.3d
> 503, 521-22 (7th Cir. 2009); *Stubbe-Danielson
> v. Astrue*, 539 F.3d 1169, 1173-76 (9th Cir.
> 2008); *Howard v. Massanari*, 255 F.3d 577, 582
> (8th Cir. 2001).  Additionally, other circuits
> have held that hypothetical questions adequate-
> ly account for a claimant's limitations in con-
> centration, persistence, and pace when the
> questions otherwise implicitly account for
> these limitations.  *See White v. Comm'r of Soc.
> Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (con-
> cluding that the ALJ's reference to a moderate
> limitation in maintaining "attention and con-
> centration" sufficiently represented the clai-
> mant's limitations in concentration, persis-
> tence, and pace); *Thomas v. Barnhart*, 278 F.3d
> 947, 956 (9th Cir. 2002) (concluding that the
> hypothetical question adequately incorporated
> the claimant's limitations in concentration,
> persistence, and pace when the ALJ instructed
> the vocational expert to credit fully medical
> testimony related to those limitations).

28  *Winschel*, 631 F.3d at 1180-81.

77 - FINDINGS & RECOMMENDATION

"A hypothetical question posed to a vocational expert must include all of the claimant's functional limitations, both physical and mental.'" *Brink v. Comm'r*, 343 Fed. Appx. 211, 212 (9th Cir. 2009) (quoting *Flores v. Shalala*, 49 F.3d 562, 570 (9th Cir. 1995)). Dr. McConochie opined that Stelzl's processing speed was "in the borderline range," which "could be expected to limit her ability in jobs such as she has held as a file clerk and doing odd jobs in a nursing home." (A.R. 505-06)  He further noted Stelzl was slow at visual attention and task switching.  (A.R. 506)  He indicated Stelzl's "[o]verall ability to support herself has been marginal," and Stelzl is dependent on her family and local charities for sub-sistence.  (A.R. 507, 511)  He opined Stelzl's limitations are "probably congenital in nature," and there is a poor prognosis for any changes in her limitations.  (A.R. 508, 511)  Despite these findings, Dr. McConochie further opined Stelzl would be only mildly limited in her ability to carry out simple instructions, and make judgments on simple work-related decisions.  (A.R. 510)

The ALJ gave "substantial weight" to Dr. McConochie's opinions in formulating Stelzl's RFC. (A.R. 19)  The issue, then, is whether an RFC limiting Stelzl "to tasks no more complex than one to three steps, equivalent to entry level work in the Dictionary of Occupa-tional Titles," encompasses the limitations found by Dr. McConochie. *See Amanti v. Comm'r*, 2012 WL 5879530, at *5 (D. Or. Nov. 19, 2012) (Marsh, J) ("Where the ALJ credits the opinion of a physician, the ALJ must translate the plaintiff's condition as described in the physician's opinion into functional limitations in the RFC."); *Brink*, 343 Fed. Appx. at 212 (ALJ erred in failing to include, in hypothetical question, medical opinion accepted by ALJ regarding

78 - FINDINGS & RECOMMENDATION

1 claimant's limitations); *see also Bickford v. Astrue*, 2010 WL

2 4220531, at *11-12 (D. Or. Oct. 19, 2010) (King, J) (ALJ, who found

3 claimant had moderate limitations in concentration, persistence, or

4 pace, erred in relying on state agency consultant's opinion that

5 claimant could perform simple, repetitive tasks, where consultant

6 concluded claimant's "mental impairment was not severe to begin

7 with, and who opined that [claimant] had only mild difficulties in

8 concentration, persistence or pace").

9     In *Bickford*, Judge King noted the cases differ on whether an

10 individual "who suffers from moderate difficulties in concentration

11 can perform simple, repetitive tasks." *Id.*, at *11 (citing *Stubbs-*

12 *Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008); *Howard v.*

13 *Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)). Judge King held, "In

14 short, so long as the ALJ's decision is supported by medical evi-

15 dence, a limitation to simple, repetitive work can account for

16 moderate difficulties in concentration, persistence or pace." *Id.;*

17 *see Brink*, 2013 WL 1785803, at *7 ("[T]he ALJ translated plaintiff's

18 moderate limitation in concentration, persistence, or pace into the

19 only concrete restriction - i.e. for simple, repetitive tasks of one

20 to three steps - outlined in the medical evidence.").

21     In the present case, the court finds a hypothetical question

22 limiting the claimant to "tasks no more complex than one to three

23 steps or the equivalent of SVP2, entry level work" fails to account

24 for Dr. McConochie's opinion that Stelzl's processing speed likely

25 "could be expected to limit her ability in jobs such as she has held

26 as a file clerk and doing odd jobs in a nursing home," or his

27 finding that Stelzl has a slow pace in visual attention and task

28 switching. There was no testimony from the VE to indicate that one-

1  to three-step, entry-level tasks would meet those limitations.  The
2  appropriate remedy, therefore, is remand to the Commissioner "so
3  that the ALJ can clarify [her] hypothetical and determine whether
4  [Stelzl] is able to perform gainful employment in the national
5  economy."  *Brink*, 343 Fed. App. at 212-13 (citing *Benecke v.*
6  *Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).

7
8                        **VI.  CONCLUSION**

9       Upon review of a final decision of the Commissioner, the court
10 may enter "a judgment affirming, modifying, or reversing the
11 decision, . . . with or without remanding the cause" for further
12 proceedings.  42 U.S.C. § 405(g).  Here, the court finds further
13 development of the record is warranted.  Specifically, the ALJ
14 should revisit her credibility analysis of Stelzl, in the context
15 of all of the evidence of record, and should give greater weight to
16 the testimony of Leslie Stelzl.  The ALJ also should state her
17 reasons for rejecting Dr. Gordon's opinion, and obtain new voca-
18 tional testimony based on a hypothetical question that accurately
19 encompasses all of Stelzl's limitations.

20
21                    **VII.  SCHEDULING ORDER**

22      These Findings and Recommendations will be referred to a
23 district judge. Objections, if any, are due by **October 4, 2013**. If
24 no objections are filed, then the Findings and Recommendations will
25 go under advisement on that date.  If objections are filed, then any
26 response is due by **October 21, 2013**.  By the earlier of the response

27
28

1  due date or the date a response is filed, the Findings and

2  Recommendations will go under advisement.

3      IT IS SO ORDERED.

4                          Dated this <u>16th</u> day of September, 2013.

5

6                          /s/ Dennis J. Hubel

7                          _____
                           Dennis James Hubel
8                          Unites States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

81 - FINDINGS & RECOMMENDATION